**Affirmed in Part, Reversed and Rendered in Part, and Opinion filed October 21, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00615-CV

---

## KATY INTERNATIONAL, INC. F/KA/ EMER INTERNATIONAL, INC., MENGGHUI ZHANG AND BINGHUA JIANG, Appellants

### V.

### JINCHUN JIANG, Appellee

---

**On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2010-27621**

---

### O P I N I O N

Appellee Jinchun Jiang is a former shareholder of Emer International, Inc. (now known as Katy International, Inc.). He filed suit against appellants Emer International and its remaining shareholders, Mengghui Zhang and Binghua Jiang,

for breach of contract.[1]  In eight issues, appellants challenge the trial court's final judgment and sanctions order.  We reverse the judgment against Zhang and Binghua and render judgment in their favor because we conclude they are not personally liable for breach of the subject contract as a matter of law.  We affirm the trial court's judgment in all other respects and overrule appellants' issue complaining of the trial court's sanctions order.

## *Background*

Zhang, Binghua, and Jinchun were shareholders of Emer International, a Texas corporation in the oilfield equipment industry.  Emer International also had investments in other companies, including Jinxi Axle Company.  After Jinchun informed Binghua he wanted to leave the company, the parties entered into a series of agreements to effectuate Jinchun's separation.  Three of the agreements are relevant to this appeal, which we discuss below.

**I.     Agreements Relevant to this Appeal**

**A. Emer International Inc. Capital Allocation Preliminary Plan (Plan)**

This document outlines a plan to divide Emer International's accounts receivable, fixed assets, debts, and taxes among Zhang, Binghua, and Jinchun.  It includes a section entitled "Investments in other companies," which states: "Investment in Jinxi Axle Company, Ltd[.]: After [Jinxi Axle] goes public, the shares will be cashed-out and each party will receive one third of the total respectively according to the Securities Commission regulations."  The Plan is signed by Zhang, Binghua, and Jinchun.

---

[1] For clarity, we refer to Jinchun and Binghua by their first names.

### B. Agreement

In the document entitled simply "Agreement," the "undersigned, being all the shareholders and directors of Emer International [Zhang, Binghua, and Jinchun]" agreed to terms regarding Jinchun's withdrawal from Emer International. The parties agreed that Jinchun would sell his share of the company retroactive to December 2003.[2] After the effective date, Jinchun was not responsible for "new business operation[s or] activities" of the company and would not be "entitled to the business and financial gains or . . . responsible for any los[s]es or liabilities generated by or from" them. Jinchun and the company subsequently would "work out the details of purchase and sale of [Jinchun's] shares . . . as well as other relevant issues."

### C. Stock Purchase Agreement

In this agreement between Jinchun and Emer International, Jinchun agreed to sell his stock in Emer International to the company for nearly $500,000. Zhang signed this agreement on behalf of Emer International.

### II.    2006 Lawsuit and Settlement

Jinchun sued appellants in 2006. He alleged that Emer International had paid him only approximately $60,000 of the nearly $500,000 owed him under the Stock Purchase Agreement. He brought claims against Emer International for breach of contract and against Zhang and Binghua for tortious interference with contract. The lawsuit settled in July 2007, and the parties signed a "Full and Final Release Agreement" pursuant to which appellants agreed to pay Jinchun nearly $500,000 in exchange for a release of:

all claims and causes of action being asserted [or which might have

---

[2] The parties signed the Agreement in June 2004.

3

been asserted] in [the 2006 lawsuit] and arising from the circumstances and occurrences made the basis of [Jinchun's] claims as more particularly described in the pleadings, including . . . any and all unknown claims which have resulted or may result from the alleged acts or omissions of [appellants].

### III. This Lawsuit

Jinchun alleges the parties performed all the requirements under the Plan, except for selling Emer International's stock in Jinxi Axle after it went public and paying Jinchun for his share. Instead, as alleged, Emer International pledged the stock as collateral for a loan and, when it failed to pay back the loan, purportedly transferred the stock to the lender. Jinchun sued appellants for breach of contract.

During the course of litigation, the trial court granted Jinchun's motion to compel discovery of documents relating to the transfer of the Jinxi Axle stock and its value. Jinchun subsequently filed a motion for sanctions. The trial court granted the motion and ordered appellants to pay $1,000 in attorney's fees. After a trial on the merits, the jury found, among other things, that appellants had breached the Plan, the breach was not excused, and Jinchun was entitled to damages of 23.04 RMB[3] per share of the Jinxi Axle stock.

### *Discussion*

Appellants complain in six issues that (1) the Plan is not an enforceable contract as a matter of law; (2) the Stock Purchase Agreement constituted an accord and satisfaction of the Plan; (3) Jinchun's claims in this lawsuit are barred by the release in the 2006 lawsuit; and (4) Jinchun did not present legally and factually sufficient evidence of his interest in the Jinxi Axle stock, to show that the corporate form should be disregarded to hold the shareholders individually liable, or of the value of the Jinxi Axle stock. In their remaining two issues, appellants

---

[3] RMB is the abbreviation for the Chinese currency Yuan Renminbi.

4

argue the trial court abused its discretion in awarding sanctions to Jinchun and if this court reverses the judgment, Jinchun is not entitled to attorneys' fees.

We conclude no evidence supports the trial court's entry of judgment against Zhang and Binghua, reverse that portion of the judgment, and render a take nothing judgment in their favor. We affirm the judgment in all other respects. For reasons discussed below, we further overrule appellants' issue complaining of the trial court's sanctions order.

## I.     Standards of Review Applied to Motions for JNOV and New Trial

In their first six issues, appellants do not challenge a specific ruling by the trial court. However, appellants raised these issues below in a "Motion for Judgment Notwithstanding the Judgment and/or Motion for New Trial." We interpret these issues as a challenge to the trial court's denial of that motion.[4] *See, e.g., Synergy Mgmt. Group, L.L.C. v. Thompson*, 398 S.W.3d 843, 845 (Tex. App.—Eastland 2012, no pet.).

We review a trial court's ruling on a motion for JNOV under a legal-sufficiency standard.[5] *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) ("[T]he test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review."); *see also Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). When reviewing the

---

[4] In a jury trial, legal sufficiency issues must be preserved through one of the following procedural steps in the trial court: (1) a motion for instructed verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection to the submission of the question to the jury; (4) a motion to disregard the jury's answer to a vital fact question; or (5) a motion for new trial. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992); *Funes v. Villatoro*, 352 S.W.3d 200, 217-18 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

[5] We also review a trial court's ruling on a legal sufficiency challenge in a motion for new trial under the same standard. *See Prabhakar v. Fritzgerald*, No. 05-10-00126-CV, 2012 WL 3667400, at *3-4 (Tex. App.—Dallas Aug. 24, 2012, no pet.).

legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We credit favorable evidence if a reasonable factfinder could do so, and disregard contrary evidence unless a reasonable factfinder could not do so. *Id.* at 827.

The evidence is legally sufficient if it would enable a reasonable and fair-minded person to reach the verdict under review. *Id.* Evidence is legally insufficient when (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. To the extent that the trial court's ruling on a JNOV is based on a question of law, we review that aspect of the ruling de novo, applying the rule that a motion for JNOV should be granted when (1) the evidence is conclusive and one party is entitled to recover as a matter of law, or (2) a legal principle precludes recovery. *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 396 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 662 (Tex. App.—Dallas 2004, pet. denied).

A factual sufficiency challenge must be raised in a motion for new trial. *See* Tex. R. Civ. P. 324(b)(2), (3); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Appellants' factual sufficiency challenge was included in its combined JNOV and new trial motion. In reviewing the factual sufficiency challenge, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly

wrong and manifestly unjust. *Id.* We may not substitute our own judgment for that of the trier of fact. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Jones v. Smith*, 291 S.W.3d 549, 555 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

## II. Enforceability of the Plan

In their first issue, appellants argue that the Plan is not an enforceable contract because the parties did not have a meeting of the minds as to its essential terms and it was not supported by consideration. The jury found that the Plan "constituted an agreement whereby Jinchun [and appellants] agreed to the disposition of an investment in Jinxi Axle Company . . . and the distribution of the proceeds."

### A. Terms of Plan Not Indefinite

Appellants argue the parties did not have a meeting of the minds as to the essential terms of the Plan because certain terms and conditions were left open for future negotiation and agreement, relating to the identities of the parties to the Plan and specific details regarding the future sale of Jinxi Axle stock. Appellants contend that the Plan was only an agreement to agree. Jinchun asserts correctly that this is not a meeting of the minds issue; rather, it is an issue related to whether the material terms of the Plan are definite.

A contract must define its essential terms with sufficient detail to allow a court to determine the obligations of the parties.[6] *Fort Worth Indep. Sch. Dist. v.*

---

[6] For a contract to be legally binding, the parties also must have a meeting of the minds and must communicate consent to the terms of the agreement. *Angelou v. Afr. Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The determination of a meeting of the minds is based on an objective standard of what the parties said and did rather than on their subjective state of mind. *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 556 (Tex.

*City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.). If a contract is not specific enough for the parties to understand their material obligations, it will fail for indefiniteness. *Fort Worth ISD*, 22 S.W.3d at 846; *Abatement Inc. v. Williams*, 324 S.W.3d 858, 861-62 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Whether an agreement fails for indefiniteness is a question of law. *Williams*, 324 S.W.3d at 862. When an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding on the parties and merely constitutes an agreement to agree. *Fort Worth ISD*, 22 S.W.3d at 846; *Sadeghi*, 270 S.W.3d at 776. However, not every detail must be spelled out in a contract. *Williams*, 324 S.W.3d at 862. Undefined contractual terms should be interpreted according to common usage, and so doing does not render the contract unenforceable. *Id*.

Appellants argue the provision of the Plan regarding the sale of the Jinxi Axle stock is indefinite. The provision reads as follows:

> Investment in Jinxi Axle Stock Company, Ltd.: After the company goes public, the shares will be cashed-out and each party will receive one third of the total respectively according to the applicable Securities Commission regulations.

Appellants contend the following terms and conditions were left open for future negotiation: who the parties are; what "goes public," "cashed-out" and "the total" mean; how many shares will be cashed out and when; who is entitled to the one-

App.—Houston [14th Dist.] 2002, no pet.). Because appellants' argument that the Plan was an agreement to agree is a legal issue regarding the contract's definiteness, we do not analyze whether the parties had a meeting of the minds. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *Sadeghi v. Gang*, 270 S.W.3d 773, 776 (Tex. App.—Dallas 2008, no pet.). Whether a particular agreement constitutes an enforceable contract is generally a question of law, whereas whether the parties intended to enter an agreement is generally a question of fact. *Sadeghi*, 270 S.W.3d at 776.

third payment; who owns the stock; what benefit Emer International would receive for the sale of its property; whether Emer International could dispose of the stock before Jinxi Axle goes public; whether the stock must be cashed out for fair market value or a minimum price; and what "Securities Commission regulations" applied.

However, the material terms of the Plan with regard to the Jinxi Axle stock are clear. When Jinxi Axle went public, the Emer International shareholders, who each signed the agreement and controlled Emer International, would effect a sale of the shares in accordance with "applicable Securities Commission regulations," and each shareholder would receive one-third of the proceeds. As set forth below, the shareholders, as the sole equitable owners of Emer International's property, were entitled to dispose of it. *See In re Estate of Trevino*, 195 S.W.3d 223, 230 (Tex. App.—San Antonio 2006, no pet.); *Martin v. Martin, Martin & Richards, Inc.*, 12 S.W.3d 120, 124 (Tex. App.—Fort Worth 1999, no pet.). Thus, they had the authority to sell the shares.

Under the common usage of the terms in the provision, requiring the shares to be "cashed out" after Jinxi Axle "goes public" indicates that the shares were to be sold after an initial public offering.[7] *See, e.g., In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 869 (S.D. Tex. 2002), *aff'd sub nom. Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003) (noting company "went public through an initial public offering"); *Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 347 (Tex. App.—Dallas 2004, pet. denied) (noting company "planned to go public" through an initial public offering). The number of shares to be sold likewise is not indefinite. The use of the word "the" before the word "shares"

---

[7] An initial public offering is an initial offering made to the general public for the sale of securities. *Black's Law Dictionary* 1111-12 (7th ed. 1999). A "cashout" is "[a]n arrangement by a seller to receive the entire amount of equity in cash rather than retain an interest in the property." *Id*. 209.

9

indicates that all of the Jinxi Axle shares owned by Emer International would be sold, as opposed to a portion of the shares, which easily could have been indicated in the Plan had the parties intended only to sell a portion of the shares.

The title of the Plan, "Emer International, Inc. Capital Allocation Preliminary Plan," signifies that its purpose was to allocate Emer International's capital and thus that Emer International owned the shares. Regarding the "benefit Emer International would receive for the sale of its property," it would receive the capital from the sale of the shares. The shareholders, as the owners of Emer International, could then distribute that capital to themselves. Moreover, as discussed below, Emer International received other benefits under the Plan.

Under the plain language of the Plan, Emer International was to cash out the shares "after the company [went] public" and not before. The method of calculating the sales price in a contract may be left for future determination when there is no evidence that term was important to the parties when the contract was being negotiated. *See Williams*, 324 S.W.3d at 862. The "applicable Securities Commission regulations" is ascertainable information. We see no impediment to the enforceability of the Plan based on the contention that the applicable regulations were left to be identified in the future. The terms of the Plan relating to the sale of the Jinxi Axle stock were specific enough for the parties to understand their material obligations.[8] *See id*.

## B. Plan Supported by Consideration

Appellants also argue that the Plan is unenforceable because Jinchun did not present evidence that it was supported by consideration. *See WCW Int'l, Inc. v. Broussard*, No. 14-12-00940-CV, 2014 WL 2700892, at *9 (Tex. App.—Houston

---

[8] We discuss the identity of the parties below.

10

[14th Dist.] Mar. 4, 2014, pet. filed) (sub. mem. op.) ("Generally, a contract must be supported by consideration to be enforceable."). Consideration consists of either a benefit to the promisor or a detriment to the promisee. *Id.* It is a present exchange bargained for in return for a promise. *Id.* It may consist of some right, interest, or profit, or benefit that accrues to one party or of some forbearance, loss, or responsibility that is undertaken or incurred by the other party. *Id.*

Jinchun was not required to present evidence that the Plan was supported by consideration. The burden of proving lack of consideration is upon the person pleading it because a written contract generally is presumed to be supported by consideration. *Id.* However, parol evidence may be used to show want of consideration. *Id.*

Here, the presumption of consideration applies. *See id.* at *10 (quoting *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[A] written instrument reciting a consideration imports one . . .") (first alteration in original)). Under the Plan, Jinchun was to receive one-third of the sales price of the Jinxi Axle stock. In return, Jinchun would be divested of his interest in that stock as a shareholder of Emer International. Jinchun would also (1) pursue collections for certain accounts receivable in exchange for 20% of the recovered funds to cover collection expenses; (2) assume one-third of Emer International's debts incurred prior to October 31, 2002; (3) assume his own debts incurred from November 1, 2003 to December 31, 2003; (4) jointly assume other debts with Zhang and Binghua; and (5) assume certain losses from 2003. The same benefits and detriments were imposed on Zhang and Binghua under the Plan. Thus, Emer International benefited from the Plan.

To overcome the presumption of consideration, appellants were required to demonstrate that they conclusively proved their affirmative defense of lack of

11

consideration. *See id.* They were required to conclusively rebut the presumption of consideration and conclusively establish that the Plan failed for lack of consideration. *See id.* Because appellants contend that the evidence that the Plan is supported by consideration is legally insufficient, they also bear the appellate burden to show that the evidence establishes as a matter of law all vital facts in support of the issue. *See id.* Zhang admitted at trial that every provision of the Plan except that pertaining to the Jinxi Axle stock was performed. This evidence, viewed in the light most favorable to the verdict, leads us to conclude that appellants failed to overcome the presumption of consideration or conclusively establish their affirmative defense that the Plan lacked consideration. *See id.* at *11.

We conclude that the terms of the Plan relating to the sale of the Jinxi Axle stock were specific enough for the parties to understand their material obligations and appellants failed to establish the Plan was not supported by consideration. Accordingly, the trial court did not err in denying appellants' combined motion for JNOV or new trial because the Plan was enforceable as a matter of law and thus the evidence supporting the jury's finding that the Plan was an agreement to dispose of the Jinxi Axle stock is legally sufficient. We overrule appellants' first issue.

### III. No Accord and Satisfaction

In their second issue, appellants argue the Stock Purchase Agreement (which they refer to as the "Second Stock Purchase Agreement") constituted an accord and satisfaction of the Plan. The jury found that appellants' breach of the Plan was not excused. The jury was instructed that appellants' breach would have been excused if an accord and satisfaction had replaced the Plan or if Jinchun's claims in the lawsuit had been released.

12

The Stock Purchase Agreement defines "Shares" as "stock and rights to stock" in Emer International. It does not expressly mention the Plan or the Jinxi Axle stock. Moreover, the Plan does not reference Jinchun's shares in Emer International stock.

The defense of accord and satisfaction rests on a contract in which the parties agree to the discharge of an existing obligation by means of a subsequent payment tendered and accepted. *Huang v. Don McGill Toyota, Inc.*, 209 S.W.3d 674, 681 (Tex. App.—Houston [14th Dist.] 2006, no pet.). For the accord and satisfaction defense to prevail, there must be evidence that there was a dispute between the parties and they specifically and intentionally agreed to discharge the party's obligations. *Id.*; *see also Custom Transit, L.P. v. Flatrolled Steel, Inc.*, 375 S.W.3d 337, 347 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("[F]or this defense to prevail, there must be a dispute and an unmistakable communication to the creditor that tender of the reduced sum is upon the condition that acceptance will satisfy the underlying obligation." (alteration in original, citation omitted)).

Appellants have pointed to no evidence on the face of the Stock Purchase Agreement of a dispute between the parties or that the parties intended to discharge their obligations under the Plan by entering into the Stock Purchase Agreement. The Stock Purchase Agreement deals solely with the sale of Jinchun's shares in Emer International back to the company. Appellants argue the following is evidence of an accord and satisfaction: an email from Zhang to Jinchun regarding the sale of Jinchun's shares in Emer International and a company valuation prepared by Jinchun that did not identify the Jinxi Axle stock. Assuming without deciding that we can consider this parol evidence when the purported accord and satisfaction is a written contract, we conclude the evidence does not support

13

appellants' position.[9]

Zhang's email discusses entering into a "formal sell/purchase agreement in which [Emer International] will purchase the 1/3 share of [Emer International] from [Jinchun]." It references a prior "agreement for [Jinchun] to withdraw and an asset settlement[ ]agreement" and indicates that the terms of the formal agreement would be "based on the two agreements we have entered." It also states, "I . . . will feel much better than having this loose agreement." However, it is not an "unmistakable communication" to Jinchun that entering an agreement to sell his shares in Emer International would discharge Emer International's obligation with regard to the Jinxi Axle stock under the Plan. *See Custom Transit, L.P.*, 375 S.W.3d at 347. It neither specifically identifies the two agreements nor references any type of dispute with Jinchun. Nothing in the email supports an inference that Jinchun was leaving Emer International on other than good terms.

The valuation prepared by Jinchun similarly does not support an inference that the Stock Purchase Agreement was an accord and satisfaction of the Plan. If anything, it supports an inference that Jinchun intentionally left the Jinxi Axle stock out of the valuation because the Stock Purchase Agreement was negotiated and signed before Jinxi Axle went public and could have been sold under the Plan.[10] Moreover, Jinchun testified when he prepared the valuation, he did not know what the Jinxi Axle stock would be worth when the company went public.

---

[9] *See Commerce Sav. Ass'n of Brazoria Cnty. v. S/C Mgmt. 108, Ltd.*, 681 S.W.2d 200, 202 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (noting that parol evidence is admissible to prove defense of oral accord and satisfaction but not addressing whether parol evidence would be admissible to prove existence of a written accord and satisfaction).

[10] The Stock Purchase Agreement was effective January 1, 2004. Jinchun testified Jinxi Axle went public "early in[,] I believe[,] May 2004." Jinchun further testified that the Jinxi Axle stock could not be sold for more than a year after the company went public due to applicable securities regulations. According to Jinchun, the stock could not be sold until after December 29, 2006.

14

This also supports an inference that the parties did not intend any obligations under the Stock Purchase Agreement to replace Emer International's obligations with regard to the Jinxi Axle stock under the Plan.

Appellants have not established there was a dispute between the parties when the Stock Purchase Agreement was executed or that the parties specifically and intentionally agreed to discharge their obligations with regard to the Jinxi Axle stock under the Plan. Accordingly, the trial court did not err in denying appellants' combined motion for JNOV or new trial because legally sufficient evidence supports the jury's conclusion that appellants' breach of the Plan was not excused on the basis that the Stock Purchase Agreement was an accord and satisfaction of the Plan.

We overrule appellants' second issue.

## IV. Claims Not Released

In their third issue, appellants argue Jinchun's claims in this lawsuit were barred because he broadly released all claims related to his separation from Emer International in the 2006 lawsuit. Jinchun argues, to the contrary, that the release was limited to the claims "arising from the circumstances and occurrences made the basis of [Jinchun's] claims as more particularly described in the pleadings" in the 2006 lawsuit that were not related to the parties' agreement regarding the disposition of the Jinxi Axle stock. As set forth above, the jury did not find that appellants' breach of the Plan was excused based on a release of Jinchun's claims in this lawsuit.

A release is a writing that provides a duty or obligation owed to one party to the release is discharged immediately on the occurrence of a condition. *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Like any other agreement, a release is subject to the rules of

15

construction governing contracts. *Id.* When construing a contract, we must give effect to the true intentions of the parties as expressed in the written instrument. *Id.* The contract must be read as a whole, rather than by isolating a certain phrase, sentence, or section of the agreement. *Id.* The language in a contract is to be given its plain meaning unless doing so would defeat the parties' intent. *Id.*

To effectively release a claim, the releasing instrument must "mention" the claim to be released. *Id.* Any claims not "clearly within the subject matter" of the release are not discharged, even if those claims exist when the release is executed. *Id.* It is not necessary, however, for the parties to anticipate and identify every potential cause of action relating to the subject matter of the release. *Id.* (citing *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000)). Although releases generally contemplate claims existing at the time of execution, a valid release may also encompass unknown claims and damages that develop in the future. *Id.*

Jinchun released, in relevant part:

- [A]ny and all past, present, or future claims, demands, obligations, actions, causes of action (independent or derivative), and/or claims which may be asserted by . . . Jinchun . . . arising from the circumstances and occurrences made the basis of [Jinchun's] claims **as more particularly described in the pleadings**, specifically including damages arising from contractual duties, negligence, deceptive trade practices, misrepresentation, breach or [sic] implied or express warranties, product liability, and/or any and all claims, demands, and causes of action or claims for damages allegedly sustained, including, but not limited to, property damage, lost profits, punitive damages, mental anguish or any other damages, expenses and compensation of any nature whatsoever, whether based on a tort, contract, or other theory of recovery, whether arising under or by virtue of any statute or regulation, and whether for compensation or punitive damages, and all

16

other losses and damages of every kind **arising from the stock purchase referenced in the above-styled lawsuit**.

- [A]ll claims and causes of action being asserted [or which might have been asserted] **in [the 2006 lawsuit]** and arising from the circumstances and occurrences made the basis of [Jinchun's] claims **as more particularly described in the pleadings**, including . . . any and all unknown claims which have resulted or may result from the alleged acts or omissions of [appellants] arising from said circumstances and occurrences . . . .

- [A]ny claims arising out of any matter or thing done by [appellants] **which is the subject matter of the captioned Lawsuit**, including but not limited to arising from contractual duties, product liability, misrepresentation, breach of express or implied warranties, and deceptive trade practices, and all claims, demands and causes of action for claims for damages allegedly sustained, including but not limited to property damage, lost profits, punitive damages, special or other damages, attorney's fees . . . , expenses and compensation of any nature whatsoever, whether based on a tort, contract, statute or other theory of recovery, whether arising under or by virtue of any statute or regulation, and whether for compensation or punitive damages, as well as all other lawsuits of any kind arising from the activities **referenced in the above-styled lawsuit**.

(Emphasis added). Accordingly, the release was limited to claims "particularly described in the pleadings," "arising from the stock purchase referenced," "being asserted," "which might have been asserted," and "which [are] the subject matter of" the 2006 lawsuit.

In the 2006 lawsuit, Jinchun alleged the following, in relevant part:

- Jinchun and appellants were shareholders of Emer International. Jinchun incurred expenses of $30,000 on behalf of Emer International for which Jinchun was never reimbursed.

17

- Jinchun and Emer International entered into a written contract, the Stock Purchase Agreement, providing that Jinchun would convey his shares of Emer International back to the company in exchange for $474,968.[11]

- Emer International had paid Jinchun approximately $57,500 of its obligation under the Stock Purchase Agreement. Emer International thus owed Jinchun a balance of $417,468 under that agreement.

- Zhang and Binghua own and control the capital stock of Emer International and failed to collect on accounts receivable and obligations owed to Emer International, thus failing to enable Emer International to fulfill its obligation under the Stock Purchase Agreement.

- Appellants failed to collect accounts receivable from Haierr Haisi Control Technologies, a company in which Zhang and Binghua have an interest.

Jinchun asserted claims against Emer International for breach of contract based on Emer International's failures to pay him pursuant to the Stock Purchase Agreement and to reimburse him for his expenses purportedly incurred on behalf of Emer International. Jinchun asserted a claim against Zhang and Binghua for tortious interference with the Stock Purchase Agreement in failing to collect on Emer International's accounts receivable, including the Haier Haisi account, thus preventing Emer International from fulfilling its obligations under the Stock Purchase Agreement.

Accordingly, the claims in the 2006 lawsuit were related to (1) Emer International's purported breach of the Stock Purchase Agreement and failure to reimburse Jinchun for expenses and (2) Zhang and Binghua's purported actions in

---

[11] The contract was apparently attached to Jinchun's petition in the 2006 lawsuit, but it was not attached to the petition admitted at trial in this case. However, Jinchun testified that his breach of contract claim in the 2006 lawsuit was related to a breach of the Stock Purchase Agreement. Moreover, under that agreement, Emer International agreed to pay Jinchun the $474,968 referenced in the petition.

facilitating the breach of the Stock Purchase Agreement. The Stock Purchase Agreement is limited to Jinchun's sale of his stock in Emer International. It neither mentions the Plan, the Jinxi Axle stock, nor more specifically, the disposition of the Jinxi Axle stock. Similarly, the release does not mention Jinxi Axle or the disposition of its stock. *See, e.g., Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) (explaining that courts narrowly construe general release clauses and "any claims not clearly within the subject matter of the release are not discharged"); *Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, 409 S.W.3d 879, 891 (Tex. App.—Houston [14th Dist.] 2013, pet. filed) (concluding release regarding quality claims for prior gas deliveries did not include claims regarding future gas deliveries even though release addressed "future claims" when such claims related only to prior delivery problems); *Baty*, 63 S.W.3d at 850 & n.7 (collecting cases enforcing release restrictions and holding that a release of claims relating to certain agreements did not act as a release of unmentioned tort claims). On the other hand, claims related to the sale of Jinchun's Emer International stock are identified in the release. The omission of the former and inclusion of the latter support an inference that the parties did not intend to release any claims related to the Jinxi Axle stock. *See Baty*, 63 S.W.3d at 854.

Appellants cite *Keck* in support of their argument that the release encompasses Jinchun's claims in this lawsuit. In *Keck*, the supreme court acknowledged that a valid release may include unknown claims and damages that develop in the future. 20 S.W.3d at 698. However, the release in *Keck* was a broad, general release as to "legal work during [a specific time] period" and was not limited, as here, to claims raised by the pleadings. *See id.* The *Keck* court noted and distinguished its earlier decision in which the parties' settlement agreement "plainly limited itself to the specific loan [at issue] and did not cover

19

[another] transaction" which was the subject of a subsequent lawsuit. *Id.* (citing *Brady*, 811 S.W.2d 931). Similarly, the release in this case was plainly limited to "claims arising from the circumstances and occurrences made the basis of [Jinchun's] claims as more particularly described in the pleadings" in the 2006 lawsuit.[12] Had the parties intended to release all claims related to Jinchun's separation from Emer International, as appellants' contend, the parties easily could have entered into a broad form general release encompassing "claims of any nature whatsoever." *See Baty*, 63 S.W.3d at 855. They did not, and we cannot rewrite the parties' release agreement to include claims not mentioned. *See id.*

We conclude that the evidence is legally sufficient to support the jury's finding that Jinchun did not release his claims related to the disposition of the Jinxi Axle stock. Accordingly, the trial court did not err in denying appellants' combined motion for JNOV or new trial because legally sufficient evidence supports the jury's conclusion that appellants' breach of the Plan was not excused on the basis that Jinchun released his claims in this lawsuit.

We overrule appellants' third issue.

## V. Legal and Factual Sufficiency Challenges

In their fourth, fifth, and sixth issues, appellants challenge the legal and

---

[12] We note that Jinchun's claim in this lawsuit relating to the disposition of the Jinxi Axle stock did not arise until after the 2006 lawsuit was filed. The lawsuit was filed on December 19, 2006. Jinchun presented evidence that the Jinxi Axle stock could not be sold until at least December 29 of that year under Chinese Securities Commission Regulations, but the stock was not actually sold until December 2007. Jinchun argues, "[a]t the time the 2006 Settlement was entered, there was no dispute between the parties regarding the Jinxi Axle Stock." However, the release was not signed until July 10, 2007, so arguably the parties' dispute about the stock could have arisen before the release was signed, as early as December 29, 2006. We need not decide when Jinchun's claims in this lawsuit arose because we nonetheless conclude that the release did not encompass Jinchun's claims in this lawsuit. *See, e.g., Baty*, 63 S.W.3d at 854 (noting entering into a settlement agreement when other claims were pending that were not referenced in the settlement agreement supported an inference that parties did not intend to include the other pending claims in the settlement agreement).

factual sufficiency of the evidence that Jinchun had an interest in the Jinxi Axle stock, that Emer International was a party to the Plan, that the corporate form should be disregarded to hold Zhang and Binghua individually liable, and of the value of the stock.

### C. Interest in the Stock

Appellants assert that Jinchun, as a shareholder of Emer International, had no interest in the Jinxi Axle stock, which belonged to the company, and the other shareholders had no authority to sell the stock and divide the proceeds. Jinchun contends that he obtained his interest in the Jinxi Axle stock through the Plan and the shareholders, as the equitable owners of Emer International's assets, were authorized to agree to the Plan.

As set forth above, the shareholders of a corporation are the equitable owners of its assets and may bind the corporation by a contract that all of the shareholders sign. *Martin*, 12 S.W.3d at 124. Accordingly, all shareholders acting in agreement, being all the beneficial owners of corporate property, may themselves deal with the property, so long as the rights of creditors are not prejudiced.[13] *Id*.

It is undisputed that Jinchun, Zhang, and Binghua were the only shareholders of Emer International when they signed the Plan. Therefore, they had the authority to bind Emer International to the terms enumerated in the Plan, which established Jinchun's interest in the Jinxi Axle stock. *See id*.

The jury found Emer International failed to comply with its agreement to provide Jinchun with one-third of the proceeds from the sale of the Jinxi Axle stock. We conclude there was more than a scintilla of evidence that Jinchun had

---

[13] In such a case, only the corporation's creditors are in a position to complain of the lack of proper action by the board of directors. *Martin*, 12 S.W.3d at 124.

21

an interest in the Jinxi Axle stock, which supports the jury's finding, and is thus legally sufficient. Moreover, the jury's finding is not against the great weight and preponderance of the evidence and thus the evidence supporting this finding is factually sufficient. Accordingly, the trial court did not err in denying appellants' combined motion for JNOV or new trial as to Jinchun's interest in the stock.

### D. No Personal Liability

Appellants argue, somewhat inconsistently, both that there is no evidence Emer International was a party to the Plan and that the corporate form should not have been set aside to hold Zhang and Binghua personally liable. Appellants argue Emer International should not be held liable for the contractual obligations of its shareholders and there is no evidence regarding whether the shareholders signed the Plan in their individual or corporate capacities. Jinchun asserts that the Plan was executed by the shareholders in both capacities because (1) the Plan dealt with the disposition of corporate assets and necessarily was executed on behalf of Emer International and (2) all the shareholders would personally benefit from the sale of the assets.

Because the Plan disposes of corporate property and binds Emer International, Emer International is a party to the Plan as a matter of law. *See id.* The evidence is thus legally and factually sufficient to support the jury's finding that Emer International agreed to the distribution of proceeds from the sale of the Jinxi Axle stock.

But Jinchun argues that Zhang and Binghua also agreed to be personally liable on the debt. A shareholder generally is not liable for the obligations of a corporation. *See* Tex. Bus. Orgs. Code §§ 21.223, 21.224. This rule applies when it is apparent from the entire contract that an officer of a corporation signed the contract on behalf of the corporation as an agent of the corporation. *Neel v. Tenet*

22

*HealthSystem Hosps. Dallas, Inc.*, 378 S.W.3d 597, 605 (Tex. App.—Dallas 2012, pet. denied). However, a shareholder may expressly agree to be personally liable for corporate obligations. *See* Tex. Bus. Orgs. Code § 21.225. We construe a contract to determine the objective intent of the parties; we do not consider the parties' present interpretations or subjective intent. *See Neel*, 378 S.W.3d at 605.

The Plan does include certain express obligations for which the parties agreed to be personally liable. The parties agreed to divide and assume responsibilities to pursue collections on accounts receivables. They also agreed to pay the mortgage on office space and to assume certain debts. However, with regard to the Jinxi Axle stock, the Plan merely states: "After the company goes public, the shares will be cashed-out and each party will receive one third of the total respectively according to the applicable Securities Commission regulation." There is no express agreement for the parties to be personally liable as to that obligation, and since the parties clearly anticipated and expressly assumed certain liabilities, they could have done so with regard to the Jinxi Axle stock.[14] Accordingly, the general rule applies, and only Emer International is liable for that corporate obligation.

Because there is no evidence that Zhang and Binghua agreed to be personally liable with regard to the disposition of the Jinxi Axle stock, we conclude that the evidence is legally insufficient to support the jury's finding of liability against Zhang and Binghua. Accordingly, the trial court erred in denying appellants' combined motion for JNOV or new trial on the basis that Zhang and

---

[14] The jury found Emer International, Zhang, and Binghua each "agreed to the disposition of an investment in Jinxi Axle Company, Ltd. and the distribution of the proceeds." Appellants objected to the jury question on the basis that "there has been legally and factually insufficient evidence to support submission of defendants' liability to the jury." However, we determine whether a corporate officer has expressly agreed to be personally liable for corporate obligations as a matter of contract interpretation, which is a question of law. *See Neel*, 378 S.W.3d at 605.

Bingua were not personally liable as to the disposition of the stock. We reverse the judgment against Zhang and Binghua and render judgment that Jinchun take nothing against them.

### E. Stock Value

**Expert Testimony Not Required**. Appellants complain that Jinchun was not an expert qualified to opine on the value of the Jinxi Axle stock. Jinchun argues no expert testimony was needed because the market value of publicly traded stock as of a certain date is a matter of public record. *See Gordon v. Gordon*, No. 09-05-330 CV, 2006 WL 5961831, at *17 (Tex. App.—Beaumont July 31, 2008, pet. denied) (mem. op.) (considering evidence introduced at trial of publicly traded stock value at various dates). Stock prices in a publicly traded corporation are "not subject to reasonable dispute, and are a proper subject for judicial notice." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 842 (11th Cir. 2004) (taking judicial notice of stock prices in securities fraud action), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *In re NAHC, Inc. Secs. Litig.*, 306 F.3d 1314, 1331 (3rd Cir. 2002) (same); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2nd Cir. 2000) (same). In this connection, such evidence is not a matter of specialized training, knowledge, or experience, and no expert testimony is required. *See* Tex. R. Evid. 702.

**Admission of Document Reflecting Stock Value Harmless**. Appellants also argue that the document on which Jinchun relied to testify as to the market value of the stock was hearsay and not properly authenticated. We review a trial court's admission of evidence under the abuse-of-discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or its decision is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42

24

(Tex. 1985).

The trial court preadmitted the document during a pretrial conference. Defense counsel objected on the grounds that the document was hearsay and Jinchun was not "qualifi[ed] to authenticate" the document.[15] Jinchun's attorney argued that the document was a "printoff" of a market report from the website Yahoo Finance, "a trusted financial source," and thus not hearsay. He further stated, "it's their continued effort to not acknowledge that the market price of the stock is the value of the Jinxi Axle shares." Texas Rule of Evidence 803(17) provides an exception to the hearsay rule for "[m]arket [r]eports . . . generally used and relied upon by the public or by persons in particular occupations." Tex. R. Evid. 803(17).

Defense counsel neither asserted that the document was anything other than a market report from Yahoo Finance nor that Yahoo Finance market reports are not "relied upon by the public or by persons in particular occupations." *See id.* However, even assuming the document was not a market report and thus was inadmissible hearsay, a trial court's error in admitting evidence is reversible only if the error probably (though not necessarily) resulted in an improper judgment. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 883 (Tex. 2014); Tex. R. App. P. 61.1. To determine whether the trial court's error was harmful, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted.[16] *Kia Motors Corp.*, 432 S.W.3d at 883.

Although defense counsel made a running objection at trial to Jinchun's

---

[15] Later, during Jinchun's testimony, defense counsel stated: "Your Honor, I'm going to renew the objection we previously made. So I don't have to interrupt this line of questioning[,] may I have a running objection as to [Jinchun] testifying as to stock value?"

[16] We note that appellants have not argued that the judgment turned on the admitted document. We nevertheless address harmless error.

25

testimony regarding the value of the stock, Zhang testified as to the value of the stock without any objection from defense counsel.[17] If a party later permits the same or similar evidence to be introduced without objection, the error in the admission of testimony generally is harmless and is waived, unless the party obtains a running objection. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *Bhatia v. Woodlands N. Houston Heart Ctr., PLLC*, 396 S.W.3d 658, 669 (Tex. App.—Houston [14th Dist.] 2013, pet. filed).

As set forth above, Jinchun testified that the stock could not have been sold until December 29, 2006. Zhang testified that the stock prices in 2007 (when the stock was actually sold) were in the same range as the prices in December 2006.[18] He agreed that the value of the stock in 2007 was between 21 and 23 RMB per share.[19] Accordingly, unobjected-to evidence was introduced through Zhang as to the value of the Jinxi Axle stock. Moreover, we take judicial notice of the fact that the values listed in the Yahoo Finance document admitted at trial accurately reflect the stock market value of the Jinxi Axle stock during the relevant timeframe.[20] *See*

---

[17] Although Zhang's testimony regarding the value of the stock was based in part on the information in the admitted document, defense counsel was required to object to this testimony to preserve error on this issue. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004).

[18] Emer International pledged the stock in December 2006 and transferred it to the lender after Emer International defaulted on the loan. The lender sold the stock in December 2007.

[19] Jinchun previously had testified that the stock values in 2007 varied between 19.8 and 32.65 RMB. The jury awarded Jinchun 23.04 RMB per share.

[20] *See* Yahoo Finance Historical Prices (Jinxi Axle Co. Ltd.), https://finance.yahoo.com/q/hp?s=600495.SS&a=04&b=26&c=2004&d=03&e=6&f=2011&g=d (active as of Sept. 11, 2014). A court of appeals, for the first time on appeal, may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994) (holding court of appeals erred in refusing to take judicial notice of published PUC order) (quoting Tex. R. Evid. 201(b)(2)); *see also, e.g.*, *Law Office of Oscar C. Gonzalez, Inc. v. Sloan*, No. 04-13-00239-CV, 2014 WL 4257875, at *12 (Tex. App.—San Antonio Aug. 29, 2014, no. pet. h.) (taking judicial notice on appeal of published post-judgment interest rate); *Roper v. CitiMortgage, Inc.*, No. 03-11-00887-CV, 2013

*La Grasta*, 358 F.3d at 842; *see also Siemers v. Wells Fargo & Co.*, No. C 05-04518 WHA, 2007 WL 1456047, at *2 (N.D. Cal. May 17, 2007) (not designated for publication) (taking judicial notice of Yahoo Finance per share price).

We conclude that the trial court's error, if any, in admitting the document was harmless because unobjected to evidence of the value of the stock was otherwise introduced at trial and the exhibit reflected accurate, publicly available information regarding the market value of the stock during the relevant timeframe.

**No Error in Jury Finding**. Appellants finally argue that the trial court erred in asking the jury to determine the RMB amount per share of the Jinxi Axle stock. The number of Jinxi Axle shares Emer International owned is undisputed. The trial court certainly could multiply the number of shares by the value found by the jury and apply the conversion rate.[21] *See* Tex. R. Evid. 201(b)-(c) (trial court may take judicial notice of facts "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

We conclude there was more than a scintilla of evidence to support the jury's valuation of the Jinxi Axle stock, and that valuation is thus legally sufficient. Moreover, the jury's finding is not against the great weight and preponderance of the evidence, and thus the evidence supporting this finding is factually sufficient. Accordingly, the trial court did not err in denying appellants' combined motion for JNOV or new trial based on appellants' contention that the jury's finding on the

---

WL 6465637, at *2 n.3 (Tex. App.—Austin Nov. 27, 2013, no. pet. h.) (mem. op.) (taking judicial notice on appeal of merger between mortgage companies); *Lazarides v. Farris*, 367 S.W.3d 788, 799 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (taking judicial notice on appeal that minutes for city council meeting were publicly available).

[21] The parties entered into a Rule 11 agreement agreeing to the proper conversion rate from RMB to U.S. dollars.

valuation of the stock was not supported by legally and factually sufficient evidence.

We sustain appellants' issue complaining of the trial court's judgment against Zhang and Binghua. We reverse that portion of the judgment and render judgment that Jinchun take nothing from Zhang and Binghua. We otherwise overrule appellants' legal and factual sufficiency challenges.

## VI. No Bill of Exception or Offer of Proof of Excluded Evidence

In their seventh issue, appellants complain of the trial court's entry of a sanctions order against them for their failure to produce documents that they allege were not in their custody, control, or possession. The trial court granted Jinchun's motion to compel responses to interrogatories that requested appellants' contentions regarding the value of the Jinxi Axle stock and related regulations. Appellants objected to the interrogatories but alleged that "[t]he market price of the stock [did] not equal the 'value' of the stock, because of the restrictions upon the sale of stock, as well as the fact that Jinchun Jiang did not have a personal ownership interest in the stock." The motion to compel also sought discovery responses to document requests supporting those contentions.

According to Jinchun, appellants never supplemented their interrogatory responses or produced documents supporting their contentions (1) that the value of the stock was different than the market price, (2) regarding when the stock was sold, or (3) regarding what restrictions were placed by the Chinese Securities Commission on the sale of the stock. The trial court sanctioned appellants by refusing to let them present evidence that the value of the stock varied from the market price or that any restrictions on the sale existed after December 29, 2006 and by requiring appellants to pay a portion of attorney's fees Jinchun incurred in seeking to compel discovery and in seeking sanctions.

28

We review a trial court's imposition of sanctions for an abuse of discretion. *See Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). We will reverse the ruling only if the trial court acted "without reference to any guiding rules and principles," such that its ruling was arbitrary or unreasonable. *See id*. In determining whether the trial court abused its discretion, we must ensure that the sanctions were appropriate or just. *See id*. We conduct a two-part inquiry in making this determination. *See id*. First, we must ensure that there is a direct relationship between the improper conduct and the sanction imposed; in other words, we must examine whether punishment was imposed upon the true offender and tailored to remedy any prejudice discovery abuse caused. *See id*. Thus, the trial court must have determined whether sanctions should be imposed on the party, its counsel, or both. *Id*. Second, we must make certain that less severe sanctions would not have been sufficient to promote compliance. *See id*.

However, we may not reach the issue of whether a sanction was excessive, and therefore evidence was erroneously excluded, unless the excluded evidence is included in the record for our review. *See FDM, Inc. v. McGovern*, No. 05-98-00678-CV, 2000 WL 1048506, at \*1 (Tex. App.—Dallas July 31, 2000, no pet.) (mem. op.); *see also Nelson v. Duesler*, No. 09-09-00288-CV, 2010 WL 1796098, at \*3 (Tex. App.—Beaumont May 6, 2010, no pet.) (mem. op.); *Walker v. Kleiman*, 896 S.W.2d 413, 417 (Tex. App.—Houston [1st Dist.] 1995, no writ). The party complaining about the exclusion of evidence must show by either a bill of exception or an offer of proof the substance of the evidence excluded. Tex. R. Evid. 103(a)(2); *FDM*, 2000 WL 1048506, at \*1. In the absence of such bill of exception or offer of proof, any error in excluding the evidence is not preserved for review. *FDM*, 2000 WL 1048506, at \*1.

The record before us does not contain a bill of exception or an offer of proof

29

indicating what the excluded evidence would have been regarding the value of the stock. *See id.* Therefore, appellants have not preserved the asserted error for review. *See id.* Additionally, even if appellants had preserved this issue for review, they have not demonstrated that the exclusion of the evidence was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a).

The sanctions order also required appellants to pay $1,000, which was a portion of the attorney's fees Jinchun incurred in seeking to compel discovery and in seeking sanctions. Appellants assert no argument as to why this sanction would have been excessive. Regardless, we conclude it was not. Because appellants failed to respond to Jinchun's discovery requests, Jinchun filed a motion to compel responses to interrogatories and production of documents supporting appellants' contentions regarding the value of the stock. The trial court granted the motion.[22] When appellants failed to comply with the order to compel, Jinchun filed the motion for sanctions and sought $2,500 in attorney's fees incurred in conjunction with filing the motions to compel and for sanctions. Jinchun's attorney filed an affidavit stating that his attorney's fees of $2,500 were reasonable and necessary. Appellants do not argue that these fees were not reasonable or necessary. The trial court ordered appellants to pay less than half these fees.

We conclude that there is a direct relationship between appellants' failures to respond to discovery—even after the trial court compelled them to do so—and the trial court's monetary sanction.[23] Moreover, less severe sanctions would not have

---

[22] Jinchun argues he was "entitled to at least a basic statement of [a]pellants' contention that the market price of the Jinxi Axle stock is not the actual value of the stock and the reasons that value would be other than as alleged by [Jinchun]." Apparently, appellants never provided this information.

[23] Appellants complain that the trial court sanctioned them for failing to produce documents outside their possession, custody, or control. Assuming the truth of that allegation,

been sufficient to promote compliance because the penalty was limited to a small portion of Jinchun's attorney's fees incurred in conjunction with the motions to compel and for sanctions.

Based on the record as a whole, we conclude the trial court did not abuse its discretion in ordering appellants to pay a portion of the fees Jinchun incurred in seeking to compel discovery and in seeking sanctions. *Cf. Khan v. Valliani*, No. 14-13-00582-CV, 2014 WL 3672986, at *5 (Tex. App.—Houston [14th Dist.] July 24, 2014, no. pet. h.) (concluding trial court did not abuse its discretion in imposing discovery sanction of attorney's fees of $400 reduced from requested amount of $750 when movant's attorney was required to move to compel discovery and arrange hearing and nonmovant produced no evidence contradicting trial court's assessment of fees).

We overrule appellants' seventh issue.

## VII. No Basis to Reverse Attorney's Fees Award against Emer International

In their eighth issue, appellants argue we should reverse the trial court's award of attorney's fees if we hold that Jinchun did not present sufficient evidence of breach of contract. Because we hold that Jinchun presented sufficient evidence of Emer International's breach of contract, we affirm the trial court's award of attorney's fees against Emer International. *See* Tex. Civ. Prac. & Rem. Code § 38.001(8) (allowing recovery of attorney's fees as to breach of contract claims). However, because we conclude the trial court erred in entering judgment in favor of Zhang and Binghua, we reverse the portion of the judgment awarding Jinchun attorney's fees against them.

---

appellants were also sanctioned for failing to respond to interrogatory requests as to the basis for their contentions regarding the proper valuation of the stock.

*Conclusion*

Having concluded no evidence supports the trial court's entry of judgment against Zhang and Binghua, we reverse that portion of the judgment, including the attorney's fees award, and render a take nothing judgment in their favor. We affirm the judgment in all other respects. We further overrule appellants' issue complaining of the trial court's sanctions order.


/s/    Martha Hill Jamison
        Justice


Panel consists of Justices Christopher, Jamison, and McCally.