YVONNE T. RODRIGUEZ, Justice
In this attorney-versus-client fee dispute, Dhara Gayle Hogg challenges a summary judgment rendered in favor of her ex-lawyers on their claim against her for breach of contract. Hogg, who attempted to resist contract payment on unconscionability grounds, asks us to reverse the summary judgment, contending that the trial court erroneously prevented her from presenting evidence of her conversations with her attorneys as a sanction for failing to turn over digital recordings of those same conversations during discovery. Hogg insists these recordings do not, in fact, exist; the trial court found otherwise. Hogg also maintains that the trial court incorrectly excluded certain other evidence from its consideration, and that an expert affidavit she submitted creates a fact issue on whether her lawyers' fees were unconscionable ab initio.
We will affirm the summary judgment.
BACKGROUND
The Contingency Agreement and the Probate Fight That Wasn't
Although the parties disagree on the law, the facts in this case for purposes of this appeal-save for one critical issue-are essentially undisputed. In April 2013, Dhara Hogg's husband George Hogg died.[1] Because it was unclear whether her husband left a will disposing of his $10 million estate, Hogg hired the law firm of Lynch, Chappell & Alsup, P.C. (LCA) to handle legal matters related to her interest in the estate. Initially, Hogg and LCA agreed that LCA Attorney Austin Ramsey would represent her on an hourly basis. But when her late husband's brother, Mark Hogg, moved to be appointed independent administrator of the estate a week later, Dhara Hogg met again with LCA, explaining that she wanted to oppose Mark's appointment and that she expected a lengthy legal fight with her brother-in-law over the estate. In connection with the impending estate litigation, Mark offered Hogg an annuity and a house if she agreed to waive her interest in the estate. LCA attorney Harper Estes advised her that she, as an intestate heir, was likely entitled to more than what Mark offered.
According to LCA, Hogg asked LCA if they would represent her on a "percentage basis" instead of an hourly basis since she had little accessible money. Hogg maintains that it was LCA that first suggested *62 the contingency arrangement. In any event, LCA avers that it advised Hogg to seek independent counsel before deciding whether to switch from an hourly rate to a contingency rate. Neither party disputes that Hogg forewent independent counsel and entered into a contingency agreement for legal services (the Contingency Agreement) on April 29, 2013. The Contingency Agreement provided that although the value of the estate was unknown, "it is thought that the estate may be comprised of an undivided interest in real property, both surface and mineral" and that LCA would receive 25 percent of any recovery Hogg received from her late husband's estate, to include any real estate interests. The Contingency Agreement also contains recitals stating that Hogg acknowledged that she was advised to seek independent counsel, and that she forewent counsel and agreed to the switch from an hourly rate to a contingency rate.
LCA's Attorneys Estes, Ramsey, and Scott Ryburn collectively worked 896 hours on Hogg's case. According to an affidavit filed by Estes, the entire estate consisted of property that "was either jointly owned as co-tenant or commingled with property of Mark Hogg." Ultimately, Dhara Hogg and Mark Hogg entered into mediation, which eventually resulted in a mediated settlement agreement (the Rule 11 Agreement) signed and entered into on December 2, 2013-approximately seven months after the Contingency Agreement was signed. The Rule 11 Agreement ended the dispute over George Hogg's estate. As part of the Rule 11 Agreement, Dhara Hogg received cash, personal property, and real property, as well as an undivided ½ interest in the sizable mineral holdings.[2]
The day after signing the Rule 11 Agreement, Hogg praised her attorneys' work in an email.[3] However, just over one month later, as the closing date for the real estate transfers governed by the Rule 11 Agreement approached, Dhara Hogg's opinion of her LCA attorneys changed. Hogg refused to pay LCA under the terms of the Contingency Agreement or to close on a real estate contract awarding LCA a portion of the oil and gas interest she inherited from her late husband. LCA then sued Hogg for breach of contract; Hogg (1) countersued for breach of fiduciary duty and fraud, (2) argued the Contingency Agreement was unconscionable, and (3) sought the remedies of constructive trust and fee forfeiture.
Fee Litigation and the Discovery Dispute
During the course of the fee dispute litigation, LCA Attorney Scott Ryburn received an unusual email from Hogg with the subject line "No no." The email read:
Hey do not mention that i recorded every meeting with those attys in midland. Idk if its legal. And u def don't want them knowing I recorded mediation! My new attys will deal with it please don't even tell ur dad! No one needs to know! Love u don't worry! Focus on u sweet baby girl. Say ur prayers. It wil all come out in the end. I only appear to be *63 stupid son! I love yall! George is watching over us! Hugs!
Thank you,
~ DGHogg~
Attorney Ryburn and Hogg's son share the same first name: he is Scott Ryburn, and Hogg's son is named Scott Whitley. After reviewing the email, LCA inferred that Hogg had accidentally sent Scott Ryburn an email intended for her son Scott Whitley. LCA served a request for production of all recordings Hogg made of the mediation and any interaction she had with LCA attorneys. Hogg answered that she, in fact, did not have any recordings. LCA moved to compel discovery, and in an affidavit and testimony at a hearing, Hogg stated that she had never made any recordings and that the email she sent to Ryburn had all been a ruse on her part. She explained her purported motives in an affidavit:
I sent an e-mail to attorney Scott Ryburn pretending it was intended for my son Scott Whitley. It said all the conversations with my lawyers had been recorded.
My reason for the e-mail was because they were lying to me or about me and I was upset and felt cheated so I thought if they believed we/I had recorded the meetings or the mediation that they would stop lying. I also wanted to see how they would react: Would they act paranoid about the possibility that others would hear this alleged recording and know that they did me wrong?
Neither I nor anyone I know made any audio, video or electronic recordings of any meetings of conversations with any attorney at Lynch, Chappell & Alsup, P.C. They do not exist and have never existed. I never made them.
She reiterated this affidavit testimony during oral testimony at a motion to compel hearing. The trial court, Judge Bob Parks presiding, disbelieved her testimony, found that the recordings existed, and granted an order compelling Hogg to turn over the recordings to LCA by June 5, 2014.
On June 3, before the discovery compliance period elapsed, Hogg attempted to invoke an arbitration clause in the Contingency Agreement and have the case transferred from the trial court to an arbitrator. The trial court denied her motion to compel arbitration on the basis of waiver, but Hogg did not immediately appeal that decision. Rather, the trial court ordered the parties to mediation, which was ultimately unsuccessful. Once mediation failed, LCA moved for a ruling on its motion for sanctions. That same day, Hogg finally timely appealed the trial court's arbitration denial. In our first run-in with these parties on interlocutory review, we upheld the trial court's decision, finding that Hogg had impliedly waived her right to arbitration by substantially invoking the judicial process, willingly participating in litigation "up until the point that she received an adverse ruling from the district court and was faced with the possibility of having the court impose case-crippling sanctions." See Hogg v. Lynch, Chappell & Alsup, P.C. , 480 S.W.3d 767, 790 (Tex.App.-El Paso 2015, no pet.) ( Hogg I ).
Meanwhile, before our stay order in the interlocutory appeal took effect,[4] the trial court held a hearing on LCA's motion for sanctions. On July 18, 2014, the trial court issued the following sanction order stemming *64 from Hogg's failure to comply with the original motion to compel:
In granting the Motion to compel, the Court was required to determine from the documentary evidence and the testimony of the witnesses whether Defendant was lying or telling the truth in a certain email she sent in which she stated that she had recorded all meetings and conversations with her attorneys and the mediation, or conversely, whether she was lying or telling the truth in her sworn testimony that she made no such recordings. The Court concluded then, and concludes now, that the Defendant made the recordings and therefore was properly compelled to produce them in response to Plaintiff's discovery requests.
...
Unless Defendant DHARA GAYLE HOGG complies with the Court's previous order compelling production of the recordings on or before July 28, 2014 at 2:00 p.m., it is the ORDER of the Court that neither DHARA GAYLE HOGG, nor anyone she allowed to be present at a meeting with or participate or listen to any conversation with her attorneys or attend the mediation herein ("Hogg Parties"), shall be permitted to testify as to any such conversation or meeting with Lynch, Chappell & Alsup, P.C., nor to any statement made or conversation held at the mediation ("Restricted Subjects") unless called to the stand by Plaintiff during the trial;
and,
it is additionally ORDERED that no deposition testimony from the Hogg Parties on any Restricted Subjects may be used by the Defendant at trial or in response to any Motion for Summary Judgment unless Plaintiff uses the deposition testimony from the Hogg Parties on a[n]y Restricted Subjects as evidence at trial or in support of its Motion for Summary Judgment;
and,
it is additionally ORDERED that Defendant may not use said recordings in any manner.
The evidence is undisputed that Hogg never turned over any recordings before July 28, 2014. In early 2016, after the stay order in Hogg I was lifted, Hogg moved for reconsideration of the sanction order before Judge Mike Swanson.[5] Judge Swanson denied the motion for reconsideration based on Judge Parks' fact-findings.
LCA Prevails in Summary Judgment
After the sanction was reaffirmed, LCA ultimately moved for summary judgment on all claims. Upon LCA's objection, the trial court excluded several pieces of evidence discussed in greater detail later in this opinion. As part of her summary judgment response, Hogg submitted an expert affidavit from Attorney Gaines West dealing with fee agreements and attorney-client relationships. The trial court did not exclude the West affidavit from its consideration.
The trial court granted summary judgment in favor of LCA on all claims. This appeal followed.
DISCUSSION
In three issues, Hogg challenges both the trial court's decision to impose sanctions and the propriety of summary judgment rendition.
A.
Defining the Issues on Appeal
Hogg and LCA trade numerous arguments regarding waiver in their replies *65 and sur-replies, so we pause at the outset to determine what issues we may actually address.
Briefing Standards
Our power of review in civil cases is constrained by what arguments appear in the parties' briefs. Pat Baker Co., Inc. v. Wilson , 971 S.W.2d 447, 450 (Tex. 1998) (appellate courts cannot address unassigned error in civil cases). The appellant's opening brief defines the threshold scope of issues we may reach in a given case. Id. ; Phillips Dev. & Realty, L.L.C. v. LJA Eng., Inc. , 499 S.W.3d 78, 89 (Tex.App.-Houston [14th Dist.] 2016, pet. denied) (court limited to reviewing points raised in appellant's opening brief). "The statement of an issue or point will be treated as covering every subsidiary question that is fairly included." TEX.R.APP.P. 38.1(f). If an issue is not raised in the appellant's opening brief, or if a sub-issue is not a "subsidiary question that is fairly included" in an issue raised in the opening brief, we cannot address that issue on appeal. Id. Simply mentioning an issue in passing is not enough to assign that issue for our review; "parties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions." San Saba Energy, L.P. v. Crawford , 171 S.W.3d 323, 338 (Tex.App.-Houston [14th Dist.] 2005, no pet.). We must interpret this specificity requirement liberally, but reasonably. Id.
In the appellant's reply brief, the appellant can respond to arguments raised in an appellee's brief and sub-issues that grow organically therefrom, but the appellant cannot use a reply brief to raise wholly new issues and thereby cure a deficiency in the opening brief. TEX.R.APP.P. 38.3 ; Fox v. City of El Paso , 292 S.W.3d 247, 249 (Tex.App.-El Paso 2009, pet. denied).
Even when the appellant and appellee have properly raised multiple issues for our review, we strive to address only those issues necessary to the resolution of the appeal so as to (1) avoid making advisory statements, and (2) keep our opinions both comprehensive and as short, clear, and user-friendly as possible. TEX.R.APP.P. 47.1 ; In re S.N. , 272 S.W.3d 45, 57-8 (Tex.App.-Waco 2008, no pet.).
Which Claims Are Before the Appellate Court?
In this case, the summary judgment disposed of both LCA's original breach of contract claim and Hogg's counterclaims. LCA maintains that we may only address the issue of LCA's breach of contract claim because Hogg, in her opening brief, failed to substantively challenge the trial court's ruling on her counterclaims. We agree.
While Issue Three in Hogg's Issue Presented section mentions her counterclaims in passing, Hogg never mentions those counterclaims again in the body of her brief, nor does she provide argument as to why rendition on her counterclaims was improper. "An appellant must attack every ground upon which summary judgment could have been granted to obtain a reversal." Rangel v. Progressive Cty. Mut. Ins. Co. , 333 S.W.3d 265, 269 (Tex.App.-El Paso 2010, pet. denied). While an appellant may preserve a challenge to a summary judgment on all grounds by lodging a general issue, "the appellant must also support the issue with argument and authorities." Id. at 270. If an appellant fails to provide substantive argument as to particular claims disposed of on summary judgment, we must affirm the summary judgment as to those claims. Id.
While Hogg discusses the merits of counterclaims in her reply brief, those argument is insufficient to allow us to reach these issues. We cannot reach Hogg's *66 counterclaims because they fall outside the scope of issues set by the substance of her opening brief. See Am. Risk Ins. Co., Inc. v. Serpikova , 522 S.W.3d 497, 505 n.7 (Tex.App.-Houston [14th Dist.] 2016, pet. denied) (each claim must be attacked individually on summary judgment). As such, we affirm the trial court's judgment as to those counterclaims and will focus our attention solely on LCA's breach of contract claim.
B.
Merits Issues
Having set the scope of issues before us in this appeal, we turn to the issues of (1) whether evidence was properly excluded from the trial court's summary judgment considerations and (2) whether, given the evidence that should have been rightfully considered, the trial court erred by finding there was no issue of material fact worthy of trial.
We review decisions to grant summary judgment de novo. Travelers Ins. Co. v. Joachim , 315 S.W.3d 860, 862 (Tex. 2010). LCA moved for traditional summary judgment on its breach of contract claim. A party is entitled to a traditional summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. TEX.R.CIV.P. 166a. We review a trial court's decision to exclude evidence from summary judgment consideration for abuse of discretion. Pettit v. Maxwell , 509 S.W.3d 542, 548 (Tex.App.-El Paso 2016, no pet.).
1.
Discovery Sanction
In Issue One, Hogg advances a twofold argument against the trial court's discovery sanction barring her from introducing any evidence of conversations she had with LCA. First, Hogg maintains that the trial court incorrectly sanctioned her for discovery abuse because it ordered her to turn over material that does not exist. Second, in the alternative, Hogg argues that the trial court abused its discretion issuing a sanction that was a disproportionate response to her alleged wrongful conduct.
We disagree with Hogg on both counts. More than a scintilla of evidence exists to support the trial court's conclusion that the recordings at issue exist, and the Texas Rules of Civil Procedure and case law supports a discovery sanction that prohibits a party from testifying about certain conversations when that same party intentionally withholds or destroys the only objective recordings that could prove what was actually said during those conversations.
Standard of Review: Discovery Orders
The propriety of an abuse-of-discovery order is reviewable on appeal of a final judgment. TEX.R.CIV.P. 215.3. "The legitimate purposes of discovery sanctions are threefold: 1) to secure compliance with discovery rules; 2) to deter other litigants from similar misconduct; and 3) to punish violators." Chrysler Corp. v. Blackmon , 841 S.W.2d 844, 849 (Tex. 1992). We review a trial court's discovery sanction decision for abuse of discretion. TransAmerican Natural Gas Corp. v. Powell , 811 S.W.2d 913, 917 (Tex. 1991). "The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles." Cire v. Cummings , 134 S.W.3d 835, 838-39 (Tex. 2004). "When reviewing a trial court's imposition of sanctions, any conflicts must be viewed in the light most favorable to the trial court's *67 ruling, and all inferences must be made in favor of the court's judgment." [Internal quotation marks omitted]. Paradigm Oil, Inc. v. Retamco Operating, Inc. , 161 S.W.3d 531, 536 (Tex.App.-San Antonio 2004, pet. denied).
We conduct a two-step inquiry when deciding whether the lower court's sanction order was proper. TransAmerican Natural Gas Corp. , 811 S.W.2d at 917. First, we must determine that a direct relationship exists "between the offensive conduct and the sanction imposed." Id. "This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. It also means that the sanction should be visited upon the offender." Id.
Second, once the nexus between the conduct and the sanction is established, we look to see that the discovery sanction is "no more severe than necessary to satisfy its legitimate purposes." Id. Sanctions cannot be excessive; "[t]he punishment should fit the crime." Id. In assessing excessiveness, we "must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance." Id. The record must show that the trial court first considered less stringent sanctions before it imposed the sanctions at issue. Cire , 134 S.W.3d at 840. The record should also contain "some explanation of the appropriateness of the sanctions imposed." Spohn Hosp. v. Mayer , 104 S.W.3d 878, 883 (Tex. 2003). "Discovery sanctions that are so severe as to inhibit presentation of the merits of a case should be reserved to address a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." Spohn Hosp. , 104 S.W.3d at 883.
Where a sanction order is issued in error, we review the error for harmlessness. TEX.R.APP.P. 44.1(a)(1) (preventing court of appeals from reversing a judgment in a civil case "on the ground that the trial court made an error of law" unless the error "probably caused the rendition of an improper judgment"). When dealing with a sanction order that excludes evidence, "we may not reach the issue of whether a sanction was excessive, and therefore evidence was erroneously excluded, unless the excluded evidence is included in the record for our review." Katy Int'l, Inc. v. Jinchun Jiang , 451 S.W.3d 74, 96 (Tex.App.-Houston [14th Dist.] 2014, pet. denied). "The party complaining about the exclusion of evidence must show by either a bill of exception or an offer of proof the substance of the evidence excluded." Id. "In the absence of such bill of exception or offer of proof, any error in excluding the evidence is not preserved for review." Id. at 96.[6]
a.
Legal Sufficiency: Existence of the Recordings
Hogg's argument in Issue One largely hinges on the predicate existence or non-existence of the recordings with her attorneys; therefore, we address this legal *68 point first. Throughout the course of these discovery proceedings and again on appeal, Hogg has strenuously insisted that the recordings she mentioned making in the Ryburn email do not exist in fact, and that her sworn testimony that the email "confession" was an elaborate ploy to rattle her ex-attorneys' nerves should exonerate her from the discovery sanction. In light of her sworn recantation, Hogg urges us to overturn the sanction, reasoning that without any corroborating evidence offered by LCA that would establish the Ryburn email's truth, the evidence underpinning the sanction order is legally insufficient.
We disagree.
Hogg is correct that she cannot be sanctioned for failing to produce the recordings if there is no evidence the recordings actually exist. Chrysler Corp. , 841 S.W.2d at 850. In determining whether a party violated a discovery order, the trial judge sits as fact finder. Brookshire Bros., Ltd. v. Aldridge , 438 S.W.3d 9, 20 (Tex. 2014). "Findings of fact are the exclusive province of the trier of fact[,]" be the fact finder, a jury, or a trial judge sitting in a case tried to the bench. Dominguez v. Castaneda , 163 S.W.3d 318, 326 (Tex.App.-El Paso 2005, pet. denied). We review the trial court's fact-findings in a discovery sanction case for legal and factual sufficiency. Cass v. Stephens , 156 S.W.3d 38, 77 (Tex.App.-El Paso 2004, pet. denied), cert. denied 552 U.S. 819, 128 S.Ct. 115, 169 L.Ed.2d 26 (2007). A party that asserts there is "no evidence" to support a finding is asserting a legal sufficiency point only. See itation index="38" url="https://cite.case.law/citations/?q=169%20L.%20Ed.%202d%2026">id. at 54-55. Because Hogg repeatedly asserts that there is no evidence to support the trial court's finding that she withheld recordings that actually exist, we construe her brief as raising only a legal sufficiency challenge on that point.
Under the legal sufficiency standard of review, we as an appellate court have no power to find facts ourselves; instead, we can only "unfind" facts. Dominguez , 163 S.W.3d at 326. But we cannot unfind a fact-and indeed must uphold a fact-finding-if there is more than a scintilla of evidence in the record to support the fact-finding. Cass , 156 S.W.3d at at 55. "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." [Internal citation and quotation marks omitted]. Id. We can only overturn a fact-finding on legal sufficiency review if there is less than a scintilla of evidence to support that finding, or if the evidence, taken as a whole, conclusively establishes the opposite fact as a matter of law, with no possibility for a reasonable difference of opinion. Id. "There is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact." Wade Oil & Gas, Inc. v. Telesis Operating Co., Inc. , 417 S.W.3d 531, 540 (Tex.App.-El Paso 2013, no pet.).
Here, Hogg's email to Scott Ryburn in which she admits to having recordings constitutes more than a scintilla of evidence that the recordings do, in fact, exist. It is direct evidence in the form of a party admission that goes beyond mere surmise or suspicion of the material fact. Her sworn recantation statements do not conclusively rebut the non-sworn contents of that email as a matter of law, but instead create a fact issue for the trial court to resolve-a fact issue that here hinges largely on how much weight the trial court gave to Hogg's testimony in light of her credibility and demeanor. We must defer to Judge Parks' findings of fact on credibility and demeanor, "since he ha[d] the opportunity to observe the demeanor of the witnesses on the stand" and could "believe all, none, or part of the witnesses' testimony."
*69 Tate v. Commodore Cty. Mut. Ins. Co. , 767 S.W.2d 219, 224 (Tex.App.-Dallas 1989, writ denied).
Given that the state of the record evidence supports conflicting inferences that would enable reasonable people to differ in their conclusions as to whether the recordings exist, we are powerless to overturn Judge Parks' predicate fact-finding that the recordings existed in fact. Cf. In re Sigmar , 270 S.W.3d 289, 298 (Tex.App.-Waco 2008, orig. proceeding) ("An abuse of discretion does not occur when the decision is based on conflicting evidence."). For appellate purposes, the existence of the recordings and Hogg's willful failure to turn the recordings over to LCA are both established. As such, we are left to determine only whether the sanction imposed for this discovery violation falls within the discretionary ambit set by TransAmerican .[7]
b.
Proportionality of Sanction
As stated previously, a discovery sanction must (1) be sufficiently tied to the offensive conduct and (2) be "no more severe than necessary to satisfy its legitimate purposes." TransAmerican Natural Gas Corp. , 811 S.W.2d at 917. No party seriously contests that the sanction preventing testimony on the subject of attorney conversations is sufficiently tied to the alleged misconduct of failing to turn over the objective recordings of those conversations in discovery so as to meet prong one of the TransAmerican test. See Cire , 134 S.W.3d at 842-43 (upholding discovery sanction directed at former client in legal malpractice case who destroyed recordings of conversations she had with her ex-lawyers). That leaves only the issue of disproportionality remaining.
When a party has violated a discovery order, TEX.R.CIV.P. 215.2 allows the trial court to sanction that party in various ways,[8] including by issuing an order "prohibiting him from introducing designated matters in evidence." TEX.R.CIV.P. 215.2(b)(4). In extraordinary situations, the trial court may also issue so-called "death *70 penalty" sanctions: those "that strike a party's pleading, dismiss the party's action, or render default judgment[,] adjudicate a claim[,] and preclude the presentation of the merits of the case[.]" In re Estate of Marley , 390 S.W.3d 421, 424 (Tex.App.-El Paso 2012, pet. denied). Death penalty sanctions implicate due process concerns and "may be imposed as an initial sanction only in exceptional cases in which lesser sanctions would not promote compliance." [Internal quotation mark omitted]. Paselk v. Rabun , 293 S.W.3d 600, 608 (Tex.App.-Texarkana 2009, pet. denied). The question of whether evidence exclusion rises to the level of a death penalty sanction "requires a case-by-case analysis." Revco, D.S., Inc. v. Cooper , 873 S.W.2d 391, 396 (Tex.App.-El Paso 1994, orig. proceeding). Ascertaining whether an order "is an outcome determinative sanction requires evidence to be presented concerning whether the case could be proven" under the terms of the order; the sanctioned party's allegations alone are not enough to meet this requirement. Paselk , 293 S.W.3d at 609.
Hogg contends that while the trial court did not actually strike her pleadings, the trial court's order excluding evidence of her conversations with her attorneys amounted to a de facto "death penalty" sanction that essentially prevented her from preventing her case. She further maintains the trial court erred by rendering a death penalty sanction as a first sanction because circumstances did not warrant a death penalty sanction. We agree that the trial court's sanction preventing Hogg from presenting evidence regarding her conversations with LCA is certainly not a trivial sanction given her unconscionability defense to LCA's breach of contract claim. Nevertheless, although the discovery sanction hobbled Hogg's ability to present her unconscionability argument-in particular her procedural unconscionability argument, which largely hinges on the content of the conversations she had with her attorneys, the sanction did not rise to the level of a death penalty sanction as a technical matter because it did not adjudicate her claim without regard to the merits. Further, Hogg fails to direct this Court to any record evidence showing that she attempted to establish that the order prevented her from presenting a case on the merits. Because of this, we cannot determine that the sanction rose to the level of a death penalty sanction warranting the heightened level of scrutiny. Revco, D.S., Inc., 873 S.W.2d at 396 (mere allegations that a sanction prevented presentment of case on the merits is insufficient; actual evidence of harm is required).
That being said, regardless of whether we treat this order excluding evidence as a death penalty sanction or not, the distinction may not matter much under these circumstances. Case law makes clear that in cases involving a party's intentional destruction of or refusal to turn over discovery materials, the trial court's discretionary authority to sanction the disobedient party encompasses all possible sanctions, up to and including a death penalty sanction. The Texas Supreme Court case of Cire , is not only instructive on this *71 point, but the factual similarities between that case and this one are striking. In Cire , a former client brought a legal malpractice suit against the law firm that had represented her in a separate case. Cire , 134 S.W.3d at 837-38. During discovery, the client testified that she had tape-recorded several conversations she had with her attorney in the underlying case, including those related to settlement. Id. When the law firm moved to compel production of the tapes in the malpractice suit, the client resisted. Id. The law firm presented evidence that the client had burned the tapes. Id. The trial court found that the client had deliberately destroyed evidence and struck the client's pleadings as a sanction. Id. at 838. The Texas Supreme Court held that the trial court's death penalty sanction was warranted: the client violated three separate orders compelling her to produce the tapes, and the law firm was prejudiced by the client's conduct because the tapes both went to the heart of the malpractice claim and were the only objective evidence of what the parties actually said. Id. at 843.
LCA argues that Cire shows the trial court would have been justified in granting the most severe sanction possible in this case; as such, the trial court did not abuse its discretion by limiting itself to the lesser sanction of evidence exclusion. Hogg insists that Cire is inapplicable because in Cire , the client readily admitted under oath to possessing the tape recordings, whereas in this case, Hogg has specifically denied possessing any recordings under oath. This distinction is inconsequential here. As we said previously, the trial court's ruling on the existence of the recordings rests on legally sufficient evidence. Hogg cannot escape Cire on that ground.
Hogg also argues that Cire should not apply because the level of discovery abuse in Cire was truly egregious, where as the alleged discovery abuse in this case was less severe. It is true that Cire involved forged documents and conflicting testimony made under oath, and this case does not. 134 S.W.3d at 838. But in all other respects, the circumstances of this case track Cire closely. In Cire , the former client of a law firm sued for legal malpractice, then failed to turn over recordings of conversations she had with her attorneys that were directly relevant to the claim. Here, the former client of a law firm was sued for breach of contract and brought various counterclaims against the law firm, then failed to turn over recordings of conversations she had with her attorneys that were directly relevant to the claim. In Cire , the client failed to comply with four separate orders compelling production. Here, Hogg failed to comply with only two discovery orders. However, she also attempted to belatedly invoke arbitration in a last-ditch Hail Mary effort to switch forums and avoid an incipient discovery sanction. See Hogg , 480 S.W.3d at 789-90. Indeed, while the specific tactics deployed in both cases vary, this case and Cire are similar in terms of degree.
We conclude that any gossamer distinctions between this case and Cire are immaterial. The record shows both evidence of restraint on the trial court's part and continued discovery abuse on Hogg's part. As required by law, the trial court explained why it passed on lesser sanctions in its order. The evidence also shows despite LCA's request for harsher sanction, the trial court did not impose the harshest possible sanction of striking Hogg's pleadings. Rather, the trial court limited the scope of its sanctions somewhat and only excluded evidence related to the subject matter captured in the recordings. Most importantly, the trial court's gavel did not fall immediately upon issuance of the order. Instead, the trial court gave Hogg one *72 last chance, stating that the order would take effect only if Hogg did not turn the recordings over by July 28-twenty days from the date of the hearing. Hogg failed to comply.
In light of the trial court's fact-finding that the recordings did exist, the trial court could have reasonably decided that Hogg's failure to comply with its orders despite being given three opportunities to do so (one voluntary, two compelled) justified an inference that the recordings contained material that was either helpful to LCA, or harmful to Hogg. In either event, LCA would be prejudiced by failing to have objective evidence proving the truth one way or the other. That justified imposing the sanction. And the reconsidering trial court, hearing the case on remand from interlocutory appeal, could have also reasonably inferred, as we did in Hogg I , that Hogg urged her stale arbitration claim in an attempt to short-circuit the trial court's sanction power and keeping the recordings out of LCA's hands. That would justify keeping the sanction in place.
After the trial court gave Hogg several opportunities to comply with discovery, she never did so. Hogg's actions in resisting discovery opened up a wide array of options that the trial court, in its discretion, could employ. Could the trial court, in its discretion, have opted to issue a less severe sanction such as a spoliation instruction at trial allowing a jury to infer that any missing evidence cut against Hogg? Yes. Did the trial court abuse its discretion under these circumstances by failing to impose a less severe sanction? No-because under Cire and similar cases, the trial court was free to decide that any lesser sanction would not have accomplished the goals of ensuring compliance with, and punishing defiance of, the trial court's order compelling production. The sanction order here, which was arrived at following deliberation, which was tailored to remedy the abusive conduct, and which allowed for compliance as a way of avoiding the sanction, was appropriate under the circumstances.
The trial court did not abuse its discretion in levying the sanction. Issue One is overruled.
2.
Admissibility of Summary Judgment Evidence
In Issue Two, Hogg maintains that the trial court erred in excluding certain evidence from its summary judgment decision. We find that these materials were either properly excluded under the sanctions order, or else that their inclusion in the summary judgment decision would not have created a genuine issue of material fact, rendering their exclusion harmless.
a.
Affidavit of Dhara Hogg
First, Hogg contends that the trial court erred in excluding three affidavits she submitted, all dealing with discussions she had with her attorneys. We agree with LCA that Hogg's affidavits ran afoul of the sanction order, and that the trial court did not err in excluding it from consideration per the terms of the sanction order.
b.
Dhara Hogg's Mediation Notes
Hogg also maintains that the trial court should have allowed notes she made during mediation in for summary judgment consideration. We disagree. The notes cover Hogg's mental impression of the mediation and recount things that people said during mediation. Admission of the mediation notes would violate the sanction order, since contain statements about *73 what was said between her and her attorneys. The portions that do not contain sanction-order-restricted information are irrelevant. The trial court did not err in excluding the notes.
c.
Deposition of Anne Johnson (Hogg's Mother)
Anne Johnson is Hogg's mother. Johnson was deposed because she was present at the initial meeting between Hogg and LCA. While Hogg concedes that much of Johnson's deposition is excludable per the terms of the sanction order, she asserts that certain deposition excerpts should have been admitted as rebuttal evidence. One of LCA's attorneys, Harper Estes, stated in a sworn statement that Hogg was the party that first suggested the contingency arrangement. In Johnson's deposition, she states that on the ride to the law firm from Monahans, Texas, Hogg never mentioned anything to her about being concerned about legal costs or wanting to enter into a contingency agreement with LCA. Hogg maintains that this specific testimony from Johnson's deposition rebuts Estes' statement that the contingency agreement was Hogg's idea. We fail to see how the statement is relevant or probative. The trial court did not err in excluding it from its summary judgment analysis.
None of Hogg's evidentiary issues have merit. Issue Two is overruled.
3.
Propriety of Summary Judgment on the Merits
Having determined that the trial court did not abuse its discretion in issuing that sanctions order and that the trial court properly excluded certain evidence from its consideration per the terms of that order, we turn finally to the merits of the summary judgment claim. In Issue Three, Hogg argues that summary judgment on LCA's breach of contract claim was granted in error because she presented evidence sufficient to create a fact issue on unconscionability. We disagree.
Unconscionability and Attorney-Client Contracts
While the parties bleed their discussions of substantive and procedural unconscionability together, it is helpful to distinguish the two types of unconscionability. Texas recognizes both procedural and substantively unconscionability as defense against contract enforcement. Delfingen US-Tex., L.P. v. Valenzuela , 407 S.W.3d 791, 797 (Tex.App.-El Paso 2013, no pet.). Substantive unconscionability refers to the inherent unfairness of a particular contract or provision; procedural unconscionability deals with the circumstances surrounding a contract's adoption. Id. " 'Unconscionability' has no precise legal definition because it is not a concept but a determination to be made in light of a variety of factors." Id. at 798. In assessing whether a contract is unconscionable under the totality of the circumstances, we consider: (1) the "entire atmosphere" in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the "non-bargaining ability" of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable. Id. "The grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse-the circumstances surrounding the negotiations must be shocking." Id.
*74 "Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized." Keck, Mahin & Cate v. Nat'l Un. Fire Ins. Co. of Pittsburgh, Pa. , 20 S.W.3d 692, 699 (Tex. 2000). "When interpreting and enforcing attorney-client fee agreements, it is not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship." [Internal citation and quotation marks omitted]. Hoover Slovacek, L.L.P. v. Walton , 206 S.W.3d 557, 560 (Tex. 2006). "[W]hether a contract, including a fee agreement between attorney and client, is contrary to public policy and unconscionable at the time it is formed is a question of law." Id. at 562. "Whether a particular fee amount or contingency percentage charged by the attorney is unconscionable under all relevant circumstances of the representation is an issue for the factfinder." Id. at 561.
As a threshold matter, we note that a contingency fee agreement in a probate case such as this one is not presumptively substantively unconscionable as a matter of law. On the contrary, the Texas Estates Code expressly provides that "a personal representative may convey or enter into a contract to convey for attorney services a contingent interest in any property sought to be recovered, not to exceed a one-third interest in the property." TEX.ESTATES CODE ANN. § 351.152(a) (West 2014). Contingency agreements granting more than a one-third interest in estate property are also permissible, but only with prior court approval. TEX.ESTATES CODE ANN. § 351.152(b). That being said, a contingency arrangement may still be found to be substantively unconscionable if a fee is unreasonable under the circumstances. But see In re Estate of Ortiz , 815 S.W.2d 858, 862 (Tex.App.-Corpus Christi-Edinburg 1991, no writ) (court of appeals would not review reasonableness of 25 percent contingency award to attorney because the Legislature specifically authorized personal representatives to enter into contingency contracts up to 30 percent).
In determining whether a fee is reasonable, we may consult the Texas Disciplinary Rules of Professional Conduct. "[T]he Rules do not create standards of civil liability for attorneys, but courts may examine the Rules to discern the policies and protections embodied in them as an aid in deciding questions of attorney civil liability." Gillespie v. Hernden , 516 S.W.3d 541, 547 (Tex.App.-San Antonio 2016, pet. denied). Rule 1.04 deals with the client-lawyer relationship. Subsection (a) prohibits a lawyer from charging a fee that is unconscionable; "[a] fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable." TEX.DISCIPLINARY R.PROF'L CONDUCT 1.04(a). Factors that may be considered in determining the reasonableness of a fee include, but not to the exclusion of other relevant factors, the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
*75 (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.
TEX.DISCIPLINARY R.PROF'L CONDUCT 1.04(b).
a.
The West Affidavit
In her opening brief, Hogg relies heavily on Gaines West's expert affidavit as proof there is a fact issue on unconscionability. LCA urges us to disregard the West affidavit as conclusory. We decline to do so.
"A conclusory statement is one that does not provide the underlying facts to support the conclusion and, therefore, is not proper summary-judgment proof." Rockwall Commons Assocs., Ltd. v. MRC Mortg. Grantor Trust I , 331 S.W.3d 500, 512 (Tex.App.-El Paso 2010, no pet.). "Legal conclusions and conclusory statements in an affidavit, without more, are insufficient to establish a right to summary judgment as a matter of law." Id. at 512.
The West affidavit deals primarily with assessing LCA's recovery under the Contingency Agreement with the average hourly rate charged in typical cases. West stated in his affidavit that according to State Bar of Texas statistics, the 2013 median rate for West Texas probate attorneys was $228; however, based on LCA's $253,956.25 bill for 896 hours of work, LCA billed at an effective rate of $283.43. West contended that this rate was "unreasonable because it is in excess of 24% over the median rate for the same type of work in the same community." West contended that at most, LCA should be entitled to receive only $204,288.00 under the standard West Texas rate. West also noted that the Contingency Agreement gave LCA an undivided 25 percent interest in all assets Hogg received from her late husband's estate, totaling $1,185,059.49 plus a 25 percent share in Hogg's mineral rights, which could produce "possibly into perpetuity." According to West, the approximately $1.18 million LCA received from the estate would result in an effective hourly rate of $1,322.61, not including mineral royalties.
West opined that the Contingency Agreement was unreasonable and unconscionable for eight reasons:[9]
(1) "This was a relatively simple probate matter involving no novel or difficult questions or a high degree of skill."
(2) West had reviewed no evidence "indicating that the acceptance of this particular employment would preclude any other employment by LCA."
(3) "The $1,185,059.49 fee plus 25% share of mineral rights LCA seeks is grossly in excess of the fee customarily charged in the locality for similar legal services."
(4) "The amount involved in this matter and the results obtained do not justify the exorbitant fee sought, especially in light of the mineral rights extending into perpetuity."
(5) West had seen "no evidence indicating that there were time limitations justifying such a high fee."
(6) West had seen "no evidence indicating a professional relationship between Ms. Hogg and LCA that *76 warrants a fee in excess of one million dollars."
(7) West had seen "no evidence indicating that the experience, reputation, and ability of the LCA attorney's [sic] involved warranted such a high fee;" and
(8) "There was no issue about the uncertainty of collection [before legal services were rendered]. In any event, it did not warrant this exorbitant fee."
LCA asserts that the West Affidavit is not competent evidence because the assertions made therein are conclusory. We agree that all the paragraphs in which West admits he reviewed "no evidence" relating to a particular Rule 1.04 factor (i.e. paragraphs 2, 6, 7) lack probative force. His averment in paragraph 1 that the estate matter was "simple" is also conclusory because West never explains what facts led him to come to that conclusion. But his affidavit cannot be dismissed outright. West stated the basis for his opinion on the reasonableness of LCA's fee: he reviewed official State Bar of Texas statistics regarding the median hourly rate for probate lawyers practicing in West Texas, and then cross-referenced that with LCA's billing records to determine whether LCA's effective hourly rate exceeded the median. On that particular issue, the West Affidavit carries some probative force.
b.
Summary Judgment Merits
Still, even with the West Affidavit in play, we do not believe that Hogg presented a fact issue on unconscionability sufficient to defeat summary judgment. The heart of Hogg's substantive unconscionability claim on appeal is that the sheer difference in size between what she paid under the Contingency Agreement and what she would have paid under a fair hourly rate demonstrates that the Contingency Agreement was unconscionable from its inception. Further, she complains that while she expected litigation to drag on, the dispute was ultimately resolved through mediation in thirty days. But everything that Hogg complains of in this respect is a risk inherent in every contingency contract, which by its nature offers "the potential of a greater fee than might be earned under a hourly billing method[.]" [Internal quotation marks omitted]. Hoover Slovacek, L.L.P., 206 S.W.3d at 561. Contingency agreements are not per se substantively unconscionable; to prove substantive unconscionability, a client must go further and show that the contingency agreement is structured in a way that shocks the conscience. See id. at 562-63 (contingency agreement with clause that required client to immediately pay contingent interest amount if client terminated the contract early was substantively unconscionable). While the amount of a fee may be substantively unconscionable, there is no evidence the fee that LCA charged here is unconscionable. On the contrary, LCA presented evidence that the 25 percent fee was lower than the usual 40 percent contingency fee they charge in similar cases. Hogg never rebutted this evidence by providing testimony, expert or otherwise, on what a reasonable contingency fee would be in a situation like this. Because West's affidavit deals with what a reasonable hourly fee would be in this situation, it is inapposite on the issue of whether the contingency percentage was unconscionable.
Hogg also argues that this type of contingency agreement is substantively unconscionable because unlike other types of contingency agreements, in which the attorneys bear risk themselves in exchange for a potential reward, LCA bore no risk at all in this case in exchange for a guaranteed *77 pay-off. But the Legislature already considered this question and decided to specifically authorize such agreements. See TEX.ESTATES CODE ANN. § 351.152(a) (allowing personal representatives to enter into contingency agreements for legal services). Further, Hogg's contention that LCA bore no risk under the Contingency Agreement here does not stand up to scrutiny. From a general standpoint, even if LCA was guaranteed some recovery under a contingency agreement in a probate matter, there was no guarantee that any recovery would actually cover LCA's costs. The risk that the work an attorney does will exceed potential recovery is one that inheres in every contingency agreement and makes a guaranteed hourly rate more desirable in many situations, particularly those which might involve protracted litigation.
From the specific standpoint of this transaction, substantial recovery was not assured. Both LCA and Hogg were uncertain as to the size of the estate and on the question of whether a will existed. A will that disinherited Hogg would mean that neither she nor her attorneys would recover anything, and a will executed before she married her husband could cause probate headaches and limit recovery as well. Indeed, Hogg's argument about the inherent unfairness of a contingency agreement in a probate matter is a double-edged sword: while under these circumstances Hogg paid more under a contingency agreement versus an hourly agreement, had she chosen to go hourly and litigation dragged on as both she and her attorneys had expected, there was a very real risk that any recovery she got would be eaten up by her attorneys' fees, exposing her to further liability in the event her inheritance did not cover all fees. By signing the contingency agreement, she limited what her attorneys could take from her, guaranteed that she would recover something, and insured herself against any potential future loss. The fact that the case settled early and ended up costing her more than she would have paid had she not changed her mind does not change the risk assessment both she and her attorneys made at the outset of their relationship-and we must measure unconscionability from the point the attorney-client relationship began, not afterwards. We cannot undo a contract that was conscionable at its inception simply because a party later regrets making the deal. Caveat emptor.
On the procedural unconscionability front, Hogg maintains that the Contingency Agreement should be reversed because as between her and her attorneys, her attorneys had more bargaining power, plus they had an ethical and fiduciary duty to advise her to do what was in her best interest. But unequal bargaining power between the parties, standing alone, does not make a contract procedurally unconscionable. Whataburger Rest., L.L.C. v. Cardwell , No. 08-13-00280-CV, 545 S.W.3d 73, 79-80, 2017 WL 3167487, at *4 (Tex.App.-El Paso July 26, 2017, no pet.) (analyzing substantive unconscionability in arbitration agreement context). As for any ethical considerations, the uncontroverted evidence shows her attorneys discharged their ethical duty to her by informing her of the conflict of interest and advising her to seek independent counsel, which she forewent.
On the fiduciary duty front, Hogg argues that her attorneys knew or should have known that the estate proceedings would be straightforward, given that George Hogg died intestate and that she and her brother-in-law Mark were the only two heirs. As such, they should have advised her to stay with the hourly option, since it would be cheaper. By withholding that information from her and leading her to believe the case would be complex when it was, in fact, very easy, Hogg contends *78 LCA fraudulently induced her into accepting an unconscionable arrangement.
In the first place, Hogg cites no authority or evidence, expert or otherwise, to show that every reasonable attorney would have believed that the administration of George Hogg's estate would be a straightforward matter and thereby allow a fact finder at trial to ultimately rule in her favor. Cf. Saldana-Fountain v. Chavez Law Firm , 450 S.W.3d 913, 918 (Tex.App.-El Paso 2014, no pet.) (holding, in legal malpractice case, that expert testimony as to strength of client's underlying case was required for trial because dispositive federal employment law issue was not a matter of common knowledge among jurors). Such evidence would have been admissible even under the terms of the sanction order. In the second place, as a matter of legal common sense, it is not unforeseeable that even where only two intestacy heirs have claim to a $10 million estate, complications may arise, which is presumably why the Legislature permitted probate attorneys to enter into certain contingency agreements in the first place. The summary judgment evidence LCA offered shows that Hogg herself anticipated a fight with her brother-in-law over assets. Hogg points to nothing in the record that would contravene any reasonable belief at the Contingency Agreement's inception that a two-heir intestacy situation could snowball into something much more complicated when dealing with acrimonious co-heirs and a $10 million estate involving both community property issues between Dhara and her husband, a co-tenancy between Mark and George, commingled personal property, oil and gas interests, various corporate entities, and potential tax issues.
We also cannot ignore the apparent difference LCA's representation made in increasing her recovery. See TEX.DISCIPLINARY R.PROF'L CONDUCT 1.04(b)(4) (taking "the amount involved and the results obtained" into consideration in measuring reasonable attorney's fees). The uncontroverted summary judgment evidence shows that Hogg's brother-in-law initially offered her a house and an annuity in exchange for a release of her heirship rights to the $10 million estate. After hiring LCA on the contingency basis, Hogg recovered by our estimate more than $4 million in assets in mediation, including mineral interests. The record evidence also shows that LCA ultimately took less than the 25 percent it was entitled to under contract, instead choosing to waive certain claims against estate personal property.
Nothing about the substance or procedure of this arrangement shocks the conscience. Absent other evidence tending to show that LCA affirmatively misled Hogg or made misrepresentations in order to induce her into signing the Contingency Agreement, we find nothing unconscionable on this record. The trial court correctly determined that LCA is entitled to its fee. Summary judgment was proper.
Issue Three is overruled.
CONCLUSION
The trial court did not abuse its discretion in rendering the discovery sanction or excluding the evidence at issue; we must defer to the trial court's findings that Hogg told the truth about making recordings in the Ryburn email, and that her failure to produce those recordings was an attempt to resist discovery. Based on the record before the trial court, summary judgment was proper because Hogg could not establish a fact question on unconscionability. We discern no reversible errors. The judgment of the trial court is affirmed.

In this opinion, we will use "Hogg" to refer to Dhara Hogg unless context requires us to clarify otherwise.

Neither party directly states the exact value of what Hogg recovered under the Rule 11 Agreement. LCA maintains in its pleadings that it is entitled to $1,185,059.40 as its 25 percent fee. Assuming LCA's fee calculation is accurate, we estimate the value of Hogg's recovery from the estate to be approximately $4,740,237, not including the value of any royalties paid thereafter on her ½ interest.

The email read:
Thank you all! I am very pleased with the outcome and more so that I chose you and your team to represent me! Thank you all so very much! God bless you and have a wonderful and safe trip! gh

Our stay order in Hogg I did not take effect until August 12, 2014. See Hogg , 480 S.W.3d at 796 n.14.

After making findings of fact and issuing the discovery sanction, Judge Bob Parks died while this case was still pending. Judge Mike Swanson assumed the case from Judge Parks.

We pause briefly to address the issue of whether Hogg was actually harmed by the trial court's exclusionary sanction. Hogg's opening brief directs us to nothing in the record that would suggest that she would have survived summary judgment had the excluded evidence been admitted instead. Nor is it apparent that Hogg ever made or attempted to make an offer of proof or a bill of review setting out other excluded evidence not then appearing in the record that would create an ultimate fact issue on liability. Without that evidence, we cannot reverse the sanction order, even if the judge issued it in error. Nevertheless, because we believe that the trial court had the discretion to render the exclusionary sanction, we will fully address that issue on the merits.

Hogg complains that the trial court never made explicit findings of culpability, prejudice, or a showing that the evidence was destroyed. The failure to make these findings explicit is immaterial here; we resolve conflicts in the evidence and draw all inferences in favor of the trial court's judgment. Paradigm Oil , 161 S.W.3d at 536. It is clear from the record that the trial court made implicit findings against Hogg on all those points.

The Rule specifically lists the following eight possible orders a trial court may issue, "among others:"
(1) an order disallowing any further discovery of any kind or of a particular kind by the disobedient party;
(2) an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him;
(3) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
(4) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
(5) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party;
(6) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;
(7) when a party has failed to comply with an order under Rule 204 requiring him to appear or produce another for examination, such orders as are listed in paragraphs (1), (2), (3), (4) or (5) of this subdivision, unless the person failing to comply shows that he is unable to appear or to produce such person for examination.
(8) In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him, or both, to pay, at such time as ordered by the court, the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. Such an order shall be subject to review on appeal from the final judgment.
Tex.R.Civ.P. 215.2(b).

West's affidavit appears to track the eight factors set out in Tex.Disciplinary R.Prof'l Conduct 1.04(b) to consider in determining the reasonableness of an attorney's fee.