PHILLIP T. WHITEAKER, Judge
Calvin Thornton was charged as a habitual offender with capital murder and aggravated robbery. He was ultimately convicted by a Pulaski County jury of aggravated robbery and the lesser-included offense of first-degree murder and was sentenced to fifty years in the Arkansas Department of Correction.[1] He appeals his convictions, alleging that the trial court erred in denying his motions for a mistrial and that there was insufficient evidence to support his first-degree-murder conviction. We affirm.
On July 8, 2015, Fred Pohnka was found beaten to death in his home. He was discovered by two coworkers after he had failed to arrive at work as a security guard at Regions Bank in Little Rock, Arkansas. The house had been ransacked. The Little Rock Police Department (LRPD) investigated Pohnka's death. They obtained a surveillance video[2] from a seminary across the street from Pohnka's house that showed two men and two women entering and exiting Pohnka's home on the day of the murder. The two women arrived first in a red vehicle, and they parked in front of Pohnka's home. They exited the vehicle and entered the residence. About fourteen minutes later, a gray or silver car parked near the home, and two men approached the house. Shortly thereafter, the two women exited the residence and got back in their car. One of the women reentered the residence, quickly exited again, and the women drove away in the red car. At about this same time, the men exited the residence and moved the gray vehicle. One of the men ran back toward the residence. He then returned to the vehicle, and they left.
Subsequently, the LRPD also discovered that one of Mr. Pohnka's bank cards had been used at several locations the day after he had been killed, including at a gas station. They obtained surveillance video from the gas station, which showed people using the card. Questioning those people led the LRPD to a suspect, Alexandria Martin. Based on further investigation, the LRPD identified Thornton, Martin, Malcolm Cooksey, and Victoria Harton as the four persons shown in the surveillance video of Pohnka's house. The LRPD later obtained a warrant for the arrest of Martin, Cooksey, and Thornton[3] on charges of aggravated robbery and capital murder in the death of Pohnka. Harton was questioned but not arrested.
Continuing its investigation, the LRPD searched the home where Cooksey had *627 been staying and found a nine-millimeter pistol wrapped in a shirt. They also investigated the two vehicles believed to have been used in the crime. In the trunk of the red car, the LRPD found bleach and Shout, a stain remover. In the gray car, they found possible blood stains on the floor mat and head rest. However, the LRPD was unable to provide any DNA profiles that matched Thornton.[4]
At trial, the State called numerous witnesses who detailed the narrative outlined above. It also presented the testimony of Dr. Charles Kokes. Dr. Kokes opined that Pohnka had died of multiple blunt-force injuries, including at least thirteen separate forceful blows to the head. Dr. Kokes explained that Pohnka's injuries did not result in instantaneous death but that it took between fifteen and forty-five minutes for him to die. During this period of time, Pohnka would have been in substantial pain.
The State presented testimony from three key witnesses concerning Thornton's involvement in Pohnka's death: Alexandria Martin, Malcolm Cooksey, and Jamarcus Hughes. Martin admitted her involvement in Pohnka's death.[5] She admitted that she was present at the house when the murder occurred and admitted knowing that Thornton and Cooksey planned to rob Pohnka. Martin's role was to drive Harton to Pohnka's house where Harton would "turn a trick," which Martin understood to mean oral sex or some sort of sexual activity between Harton and Pohnka. While Harton was engaged with Pohnka, Cooksey and Thornton planned to arrive in Martin's gray car for the robbery.
According to Martin, she and Harton arrived at Pohnka's home in a red car. Martin and Harton went into Pohnka's home, but once inside, things did not go as expected between Harton and Pohnka. As Harton and Martin were leaving the house, they passed Cooksey and Thornton on the way in. Cooksey and Thornton were wearing latex gloves. Before leaving the scene, Martin, concerned about leaving her DNA, went back inside when she realized she had left her cigarettes in the ashtray.[6] When she reentered the house, she saw Pohnka on the floor bleeding; he was still alive. Thornton was standing against the kitchen sink with a gun pointed at Pohnka. She also saw Thornton hit him.[7] Cooksey was coming out of the back room and was acting "nervous" and "spooked." He handed her a black bag, and she left. After they had driven away, Cooksey called to asked if they had his gun because he could not find it. It was in the black bag he had handed her. Later, Martin admitted that she had used the credit cards taken in the robbery to put gas in her car and several other cars and that Thornton was with her when she used the cards.[8]
Malcolm Cooksey, who pled guilty to first-degree murder and robbery and was sentenced in connection with Pohnka's death, also took the stand to testify. He corroborated some of Martin's testimony.
*628 According to Cooksey, Harton and Martin went to Pohnka's house while Thornton drove him to Kroger to buy gloves. He admitted that Pohnka's robbery had been planned in advance and that the plan was that his girlfriend, Harton, would meet Pohnka for sex; Cooksey would then rob Pohnka while he was otherwise occupied. At this point, Cooksey's testimony began to contradict that of Martin. Cooksey denied that Thornton was aware of the plan beforehand. In fact, Cooksey testified that he was the one who tripped Pohnka, causing him to fall to the floor, that he was the one who hit Pohnka, and that he was the one who ran through the house grabbing things and placing them in bags. While all this was happening, Cooksey stated Thornton looked shocked. He admitted he had previously told the police that Thornton had hit Pohnka. He stated he had given the conflicting statement regarding Thornton's involvement because he was playing the "blame game" and that, in truth, he was the one who had hit Pohnka.
Jamarcus Hughes was the last key witness to testify concerning Thornton's involvement in Pohnka's death. Hughes was an inmate where Thornton was also incarcerated. According to Hughes, Thornton admitted his involvement in a robbery that went bad. Hughes testified that Thornton admitted he had beaten someone to death. Thornton told him that he did not intend to kill the man-he was holding a gun on him, but the man would not be still. As a result, Thornton began beating the man with both his hands and the pistol; the guy later died. Thornton told Hughes that the other guy with him was stealing stuff, including guns and credit cards. Hughes denied that he had entered a deal with the State in exchange for his testimony.
Although Thornton was charged with capital murder and aggravated robbery, the jury ultimately convicted him of first-degree murder and aggravated robbery. He was sentenced to fifty years in the Arkansas Department of Correction. Thornton now appeals those convictions, alleging that the trial court erred in denying his motions for a mistrial and that there was insufficient evidence to support his first-degree-murder conviction.
Although Thornton's challenge to the sufficiency of the evidence is his third point on appeal, double-jeopardy considerations require this court to review a challenge to the sufficiency of the evidence before we review the other issues on appeal. Jones v. State , 349 Ark. 331, 335, 78 S.W.3d 104, 107 (2002). Thornton challenges the sufficiency of the State's proof supporting the first-degree-murder conviction, claiming that there was no credible evidence presented that he was an accomplice to the murder of Pohnka, that he committed the murder, or that he took part in the robbery.[9]
In order to contest the sufficiency of the evidence to support a conviction on appeal, the defendant must move for a directed verdict at the close of the prosecution and again at the close of all the evidence. Ark. R. Crim. P. 33.1(a) (2017); Doss v. State , 351 Ark. 667, 97 S.W.3d 413 (2003). Here, defense counsel moved for a directed verdict at the close of the State's case and at the close of all the evidence in compliance with the rule. However, defense counsel moved for a directed verdict only on the capital-murder charge, citing a lack of evidence to support accomplice liability. Defense counsel did not make a separate directed-verdict motion for the lesser-included offense of first-degree murder of which he was ultimately convicted.
*629 Our supreme court has made it clear that a defendant, in making a motion for directed verdict, must anticipate an instruction on a lesser-included offense and specifically address the elements of that lesser-included offense on which he or she wishes to challenge the State's proof in his or her motion. Brown v. State , 347 Ark. 308, 65 S.W.3d 394 (2001). The defendant must do so either by name or by apprising the trial court of the elements of the lesser-included offenses questioned by the motions for directed verdict. Haynes v. State , 346 Ark. 388, 58 S.W.3d 336 (2001) (concluding that a challenge to the sufficiency of the evidence to support a first-degree-murder conviction was procedurally barred when the defendant was charged with capital murder and failed to move specifically for directed verdict on the lesser-included offense of first-degree murder).
This case is factually similar to Grillot v. State , 353 Ark. 294, 107 S.W.3d 136 (2003). In Grillot , defense counsel moved for a directed verdict "as to Count 1, Capital Murder," claiming that there was insufficient evidence of accomplice liability to support the conviction. Counsel did not move for a directed verdict on the lesser-included offense of first-degree murder for which Grillot was ultimately convicted. Our supreme court held that this was insufficient to preserve the sufficiency argument on the lesser-included offense. The facts in this case warrant the same conclusion.
We now turn to Thornton's claim that the trial court erred in denying his motions for mistrial. We note that a mistrial is an extreme and drastic remedy that will be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. Burks v. State , 2009 Ark. 598, at 7, 359 S.W.3d 402, 407. The trial court has wide discretion in granting or denying a mistrial motion, and absent an abuse of that discretion, the trial court's decision will not be disturbed on appeal. Id.
Thornton's first mistrial argument relates to his request for a mistrial during the testimony of Detective Kevin Simpson. Detective Simpson, the LRPD homicide detective in charge of the investigation, was cross-examined by defense counsel about why Harton had not been charged for her role in the robbery and murder of Pohnka. On redirect, the State asked, "Are you aware that there are times where someone may be involved in a crime but for legal reasons we can't charge them or arrest them?" Defense counsel objected and asked for a mistrial. The trial court denied his request.
Thornton argues that the court erred in denying his request for a mistrial. He claims that the testimony was not relevant and misled the jury into believing that one of the four individuals involved in the crime could not legally be charged. However, even if true, the testimony was not so prejudicial as to affect the fundamental fairness of the trial. It did not call into question the guilt or innocence of Thornton, and given the other overwhelming evidence of guilt presented at trial, its admission was not unduly prejudicial. Thus, the trial court did not abuse its discretion in denying the motion for mistrial.
Thornton's second mistrial argument involves questions posed to Martin, Cooksey, and Hughes about alleged threats and witness intimidation. During her testimony, Martin admitted that she had given some conflicting statements to the police and was not exactly forthcoming in the beginning because some threats had been "thrown out." Defense counsel objected to her testimony and asked the court to admonish the jury to disregard her comments *630 regarding threats, which the court did. During the testimony of Cooksey, he denied having received any threats and denied having spoken with Thornton recently. When asked if he had seen Thornton in the courthouse that week, defense counsel again objected. The court allowed the question but cautioned the prosecutor to be careful how she asked it. During Hughes's testimony, he indicated that "it was not good to be a snitch if you were in jail" and that he had been "jumped on" for being a potential witness in the Thornton case. Once again, defense counsel objected, claiming that the State was trying to prove that Thornton or one of his associates was trying to intimidate Hughes. The court allowed the questioning over defense counsel's objection.
On appeal, Thornton argues that the court erred in not granting a mistrial in reference to the testimony of Martin, Cooksey, and Hughes. However, Thornton never actually requested a mistrial as it relates to these witnesses. As to the questioning of Martin, counsel stated, "I'd ask for a mistrial, but admonish the jury to disregard her last comment." Clearly, he did not ask for a mistrial, and the court actually granted his request to admonish the jury. As to the questioning of Cooksey, counsel again objected and stated, "If she asks this question I may have to ask for a mistrial." Again, he never actually asked for a mistrial. Finally, as to the questioning of Hughes, counsel merely objected. There was no request for a mistrial. A motion for mistrial must be raised at the first opportunity; otherwise, it is not preserved for appeal. See Jackson v. State , 375 Ark. 321, 290 S.W.3d 574 (2009). Because Thornton never asked for a mistrial, his arguments are not preserved for appeal.
Based on the foregoing, we affirm.
Affirmed.
Gladwin and Brown, JJ., agree.

He received a forty-year sentence for first-degree murder and a ten-year sentence for aggravated robbery to be served consecutively.

The video was played for the jury.

Thornton was arrested at the residence of his cousin, Shalorial Strong. Strong denied Thornton was in the home, but officers discovered him in the attic during a search of the residence. She was charged with hindering apprehension.

The blood stains appeared to have been diluted as if in an attempt to clean them up.

She testified that she had pled guilty to robbery and second-degree murder for her role in Pohnka's death and was sentenced to forty years in prison.

Martin's description of events corresponded with the movements shown on the surveillance tape obtained from the seminary.

In her statement to the police, she indicated that Cooksey hit Pohnka with the gun. She further indicated to police that Thornton did not have a gun and did not wear gloves. She admitted she changed her story somewhat in exchange for her plea deal.

Thornton could be seen on one of the gas-station surveillance videos.

On appeal, he has not challenged the sufficiency of the evidence of aggravated robbery.