Cite as 2022 Ark. App. 494

# ARKANSAS COURT OF APPEALS
DIVISION II
No. CR-22-130

| | | |
|---|---|---|
| KAYLEN BURKES | | Opinion Delivered December 7, 2022 |
| | APPELLANT | |
| | | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CR-19-459] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE MARCIA R. HEARNSBERGER, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**ROBERT J. GLADWIN, Judge**

Kaylen Burks was convicted by a Garland County jury of second-degree murder committed with a firearm and three counts of committing a terroristic act. He challenges the sufficiency of the evidence supporting the trial court's finding that he was an accomplice. He also argues that the trial court erred when it failed to include any African American jurors on the jury panel and when it instructed the jury on the lesser-included offense of second-degree murder. We affirm.

I. *Facts and Procedural History*

Burks was charged with one count each of first-degree murder and first-degree battery (both committed with a firearm) and three counts of committing a terroristic act stemming from an incident on Mother's Day, May 12, 2019. Burks had been invited by his girlfriend, Whitney Finley, to go out on a boat in Hot Springs with her family and another family. After

the excursion, both families and Burks went back to a house on Lily Ruth Court. While there, Whitney got into an argument with her brother, Donyell King. Burks intervened on her behalf, and after a verbal altercation and brief scuffle, he left the residence in his black Dodge Challenger, accompanied by Whitney, who was driving his car.

At Burks's trial, Whitney testified that, as she drove, Burks initially was quiet but subsequently became upset and angry, punching the dashboard of the car. At one point—with the car in motion—Burks opened his passenger-side door, and Whitney thought he was going to jump out, so she stopped the vehicle. At the time, they were in downtown Hot Springs. Whitney stated that while stopped, Burks was on the phone, telling the other person he "was jumped and felt punked."

Whitney explained that when it became apparent that Burks was not going to calm down and drive her back to Nashville, she got out of the car and started walking back to Nethisa McGowan's house on Lily Ruth Court. Whitney called her mother, Shaunelle King, and asked her to come get her, but then she called Burks, who agreed to take her back to Nashville. Whitney walked back to Burks's car, and he then drove to a parking lot next to the Central Avenue fountain in downtown Hot Springs. Once there, Burks got out of the car and went over and talked to another person who was in a white car. Whitney said that she joined them and heard the other person attempting to dissuade Burks from retaliating.

During that conversation, two other cars pulled into the parking lot directly behind Burks's Challenger. Burks then ran and got back into his car; Whitney followed, jumping in after him. All three of the vehicles were caught on Central Avenue's downtown surveillance

cameras and, a short while later, on a residence's Ring doorbell camera as they all passed 114 Lily Ruth Court.

Despite Whitney's protests, Burks drove back to the house on Lily Ruth Court. On the way, Whitney attempted to call her mother and sister and warn them. Burks drove onto Lily Ruth Court, turned around in the cul-de-sac at the end of street, and parked in front of the house. Whitney got out of the car and went to the front door, but no one was home. She called her mother again and was able to reach her, telling her that Burks had "called some people" and that he had come back there to fight. Whitney's mother told her that Donyell had taken her husband, Donald King, Nethisa, and her to get cigarettes.

The other cars that followed Burks onto Lily Ruth Court also had turned around in the cul-de-sac and parked behind Burks's car. Whitney, who had gone to the back of the house to try the back door, was walking back to Burks's car when she saw her brother, Donyell, along with their parents, pull up in her mother's Chevy Cruze. At that time, Burks was standing in the street, and when Donyell drove past, Burks attempted to open Donyell's car door. By the time Whitney got back down to the street, Burks had managed to get the car door open, and he and Donyell were arguing. Whitney attempted to close the car door and push Burks away from it.

At that point, another person—described as having a slight build, "shoulder length dreads," and wearing a "wife beater"—approached Whitney and Burks and asked, "Is this the n—r you beefing with?" After asking Burks the question, the person—identified by other witnesses as Burks's cousin, Tommy Woodfork, Jr.—fired four shots into the Chevy Cruze

3

driven by Donyell. After the shots were fired, Burks fled on foot, and Tommy, along with his passengers, Ashley Smith and Alana Bogy, drove off in the car in which they had arrived. Whitney said that she fell to the pavement when the shots started and then had to move to keep from getting run over by the fleeing car.

Nethisa—the fourth passenger in the car driven by Donyell—testified that when they returned to her house, there were "a whole bunch of people in front of [her] house." Nethisa explained that after Donyell had turned around in the cul-de-sac, someone started yanking on the car door. She explained that she yelled for him to keep going but that a second person appeared directly behind Burks and asked, "Is that [sic] that n—r?" and fired three shots. Nethisa said that she and Donald both got out of the car and ran toward her house but that Donald, who had been shot in the back, collapsed on the porch.[1]

Ashley testified that, at the time of Donyell's murder, she lived in Malvern, Arkansas, with Alana and Jason Burks, who were dating at the time. Ashley described how she and Tommy were friends and that Burks, along with Tommy and Jason, had all grown up together with their grandmother and were like brothers.

Ashley described how, on the day of the incident, Tommy had come to her house to visit and had accompanied her when she took dinner to Jason, who was at work. During their errand, Ashley said that Tommy got a call from Burks, who told him he had gotten into a fight. Ashley said that she and Tommy went back to her house, picked up Alana, and drove

---

[1]Donald sustained one gunshot wound but survived.

to Hot Springs in Ashley's car. Ashley said that Tommy was driving and that they first stopped at the Central Avenue fountain where Tommy talked to his father, who told them where Burks had gone.

Ashley testified that once they were on Lily Ruth Court, Tommy parked the car and got out—then she and Alana got out as well. Ashley noted that Tommy went straight to where Burks was standing, directly in front of his black Challenger, "a couple of feet" from where they were parked. Ashley further stated that there were people "exchanging words back and forth trying to get [Donyell] out of the car." She explained that as this was going on, Tommy, who was standing beside Burks, pulled out a gun and started shooting into the car. Ashley said that she—along with Tommy and Alana—ran back to her car and that she "was in shock" as Tommy quickly sped away from the scene of the shooting taking back roads and driving back to Malvern. During the ride back, Ashley said that Tommy told them, "Don't say nothing," and "This didn't happen. It's all gonna be taken care of." Once in Malvern, Tommy pulled up to a stop sign, another car pulled up beside him, and the people in the other car asked Tommy to get into their vehicle so they could "handle it from there." Tommy complied, and Ashley said that was the last time she saw him.

Alana, who lived with Ashley in Malvern, corroborated much of Ashley's account of what happened the night of the incident. She described how Burks was "tussling" with Donyell "through the car window" when someone pulled him away, and shots were fired.

Five days later, Burks was taken into custody, and he gave a statement to Detective Mark Fallis of the Hot Springs Police Department. During the questioning, Burks was

reluctant to identify the person who had shot into the car, killing Donyell and seriously wounding Donald. In Burks's first version of what happened, he claimed that after returning to the Lily Ruth Court house a second time, he got out of his vehicle and was in the street when Donyell drove up behind him. Burks claimed that he asked Whitney's mother, Shaunelle, who also was in the car, to take Whitney back to Nashville. Burks said that Shaunelle told him he would have to drive her because she had taken up for him during the earlier argument. Burks said that he asked Donyell, "Why didn't you just fight me?" Following his question, Burks said he heard Shaunelle say, "Just give me the gun," and he "took off running" and "did not look back."

During questioning, Detective Fallis disclosed to Burks that he had spoken to witnesses who had traveled to Hot Springs with the shooter, and he had also viewed video footage of Burks's car in downtown Hot Springs, where he had stopped and was met by other people who followed him back to the Lily Ruth Court house. When Detective Fallis suggested to Burks that "[y]ou called your boys and you went back to that house and shit went bad," Burks responded that he was right. Burks also told Detective Fallis that he knew he was going to prison and that he had to "do time for a lick." At other times, Burks told Detective Fallis that he was not the reason that it all happened, but he still refused to identify the shooter. However, Burks admitted that his intention was for there to be a confrontation with "that side and that side and if anything else [was] going on, then that was between me and Donyell."

Additionally, the video exhibits admitted at trial contradicted Burks's explanation of the series of events. First, as Detective Fallis testified, the downtown surveillance video showed Burks's Challenger, along with the vehicle Tommy was driving and a third vehicle, all leaving the same Central Avenue parking lot at the same time traveling north on Central Avenue. The video from the Ring doorbell camera located at 114 Lily Ruth Court—a few houses down from the house where the shooting took place—showed Burks's car returning to Nethisa's house, followed by two other cars using only driving lights or with the headlights turned off.

After the State rested its case, counsel for Burks renewed a previously denied motion for a mistrial because the jury did not include any African Americans. Counsel also moved for a directed verdict as to all charges, arguing there was insufficient evidence regarding Burks's status as an accomplice. Counsel argued that Tommy was the person who had shot the firearm into the car, several witnesses testified that there was no evidence showing that Burks did something to aid in the act or solicit or advise that the act take place, and there was insufficient evidence to show a purposeful conduct on Burks's part. Counsel also argued that Detective Fallis acknowledged that there was no evidence of participation on the part of Burks that would rise to the level of accomplice liability. She stated that if the charges were submitted to the jury, the jury would be required to resort to speculation in terms of that issue, or it might find him guilty of one charge but not all; and there is no direct evidence that he had any purposeful conduct as alleged by the State. The trial court denied those motions.

Burks chose not to testify, did not call any witnesses, and rested his case. Counsel renewed his motion for mistrial based on the racial makeup of the jury and also renewed the motion for directed verdict, both of which were denied by the trial court.

The jury convicted Burks as an accomplice on the charge of the lesser-included offense of second-degree murder, a Class A felony, in violation of Ark. Code Ann. § 5-10-103 (Repl. 2013). The jury also convicted Burks as an accomplice on three counts of committing a terroristic act, in violation of Ark. Code Ann. § 5-13-310 (Repl. 2013). The jury found that a firearm had been employed in the commission of the offenses and recommended that his sentence should be enhanced in accordance with Ark. Code Ann. § 16-90-120 (Supp. 2021).[2] The jury recommended that some of the sentences be served concurrently, but the trial court ordered all sentences to be served consecutively for an aggregate of ninety years in the Arkansas Department of Correction. The sentencing order was entered on August 3, and the notice of appeal was timely filed on August 9.

## II. *Discussion*

### A. Sufficiency of the Evidence Supporting Burks as an Accomplice

In cases implicating a theory of accomplice liability, the court will affirm if there is substantial evidence that the defendant acted as an accomplice in the commission of the alleged offense. *Finley v. State*, 2019 Ark. 336, at 2, 587 S.W.3d 223, 226. Someone can be an accomplice if he solicits, advises, encourages, or coerces the other person to commit the

---

[2]The jury acquitted Burks of the battery charge.

offense; or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense. *See* Ark. Code Ann. § 5-2-403(a)(1), (2) (Repl. 2013); *Starling v. State*, 2015 Ark. App. 429, 468 S.W.3d 294.

When causing a particular result is an element of an offense, a person is an accomplice of another in the commission of an offense if, "acting with respect to that particular result with the kind of culpable mental state sufficient for the commission of the offense, the person . . . [a]ids, agrees to aid, or attempts to aid the other person in committing it." Ark. Code Ann. § 5-2-403(b)(2); *see Smith v. State*, 2022 Ark. 95.

The standard of review for a challenge to the sufficiency of the evidence is whether, viewing the evidence most favorable to the State, there was substantial evidence sufficient to support the jury's verdict. The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *See Smith, supra.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. To be substantial, the circumstantial evidence must exclude every reasonable hypothesis other than the accused's guilt. *Keesee v. State*, 2022 Ark. 68, 641 S.W.3d 628.

Burks moved for a directed verdict on the basis of insufficient evidence that he solicited, advised, or engaged in purposeful conduct for the jury to find he should be held liable as an accomplice. He noted that Officer Fallis testified there was no evidence of participation on the part of Burks that would rise to the level of accomplice liability. He argued that submitting the charges to the jury would require it to resort to speculation.

Burks argues that, likewise, to instruct the jury on the charge of committing a terroristic act was clearly erroneous because of the lack of evidence that he aided or participated in the act of Tommy's shooting at the car. In addition, according to Whitney, when Burks placed a call while she was in the car with him, she did not hear him tell anybody to come to Hot Springs to shoot anyone.

Although Burks acknowledges that there was some evidence about an earlier argument between Donyell and him, he submits that it was not logically foreseeable that Tommy was going to shoot at the car. He urges that with no evidence that Burks aided or encouraged or otherwise participated in Tommy's three counts of committing a terroristic act against the other occupants of the car, there is not an adequate connection between his acts—without resorting to speculation—regarding commission of the terroristic acts or second-degree murder. Accordingly, he argues that the trial court should have granted a directed verdict because there was not substantial evidence to submit to the jury on the theory of accomplice liability for three charges of committing a terroristic act and second-degree murder.

We disagree. This court has held that in order to preserve challenges to the sufficiency of the evidence supporting convictions for lesser-included offenses, a defendant is required to address the lesser-included offenses either by name or by apprising the trial court of the elements of the lesser-included offenses questioned by the motion for directed verdict. *Jackson v. State*, 2018 Ark. App. 330, at 4, 553 S.W.3d 55, 58 (applying this analysis where the defendant had been charged as an accomplice).

10

In *Thornton v. State*, 2018 Ark. App. 33, 539 S.W.3d 624, another case dealing with accomplice liability, the defendant moved for a directed verdict with regard to the capital-murder charge, arguing that there was no credible evidence presented that he was an accomplice to the murder. However, he failed to move for a directed verdict on the lesser-included offense of first-degree murder for which he ultimately was convicted. We held that a defendant must anticipate lesser-included charges and refused to consider his sufficiency argument with regard to the lesser-included offense. *Id.* at 7, 539 S.W.3d at 629. The facts in this case warrant the same conclusion, precluding Burks's challenge to his conviction for second-degree murder.

Burks's directed-verdict motion applied "to each of the counts in the information—first degree murder, battery in the first degree, and three counts of committing a terroristic act." Although, his challenge to the sufficiency of the evidence supporting the convictions on charges of committing a terroristic act is preserved, we hold that the trial court did not err in denying his motion.   A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person solicits, advises, encourages, or coerces the other person to commit the offense or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense. Ark. Code Ann. § 5-2-403(a)(1) & (2) (Repl. 2013); *see also Jackson*, 2018 Ark. App. 330, at 7, 553 S.W.3d at 59. A review of the evidence before us that supports Burks's conviction for second-degree murder as an accomplice likewise supports his convictions on three counts of committing a terroristic act. Accordingly, we affirm on this point.

B. Lack of African American Jurors on the Jury Panel

We have acknowledged that a selection of "a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *Henderson v. State*, 2019 Ark. App. 220, at 3, 575 S.W.3d 617, 620. There is no requirement, however, that the petit jury actually seated in a defendant's case "mirror the community and reflect the various distinctive groups in the population." *Id.* It is axiomatic that the State may not deliberately or systematically deny to members of a defendant's race the right to participate as jurors in the administration of justice. *See id.*

In order to establish a prima facie case of deliberate or systematic exclusion, a defendant must prove that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Henderson*, *supra* (citing *Thomas v. State*, 370 Ark. 70, 257 S.W.3d 92 (2007)).

In the present case, Burks argued that there was a systematic exclusion of members of his racial group from the venire. He cites *Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996), for the proposition that the State is required to justify its procedure if a defendant makes this prima facie showing. *Id*. Burks's counsel argued that there were no jurors on the jury panel who were African American, which is a distinctive racial group under the U.S. Supreme Court's decision in *Duren v. Missouri*, 439 U.S. 357 (1979). Burks's counsel also

12

argued that there was systematic exclusion of African Americans from the jury-selection process because, of the remaining two potential African American jurors who were summoned, the numbers were "too high" for them to likely be selected. Counsel also argued that the current venire be excused and new panels be drawn or additional panels be drawn to correct the issue. Counsel also noted that only three African Americans were drawn out of a county population of close to a hundred thousand.

Prior to sentencing, counsel for Burks also submitted as evidence the roll call of jury panels 7, 9, and 10 in which counsel indicated that only three members were African American. Accordingly, Burks argues that the State should have been required to justify its procedure for drawing jurors. *Thomas*, *supra*. Because the State failed to justify its procedure for drawing jurors and the lack of any African American jurors who served in this case, Burks maintains that we should reverse his convictions.

We disagree and hold that Burks failed to make a prima facie case of a fair-cross-section violation under the above-cited cases. Burks had the burden of establishing that African Americans are systematically excluded from jury panels in Garland County. *See Mitchell*, 323 Ark. at 122, 913 S.W.2d at 267. In order to establish a prima facie violation of the fair-cross-section requirement, a defendant must demonstrate all three of the following: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in jury venires is not "fair and reasonable" in relation to the number of such persons in the community; and (3) the underrepresentation is caused by the "systematic exclusion of the group in the jury selection process." *Duren*, 439 U.S. at 364.

13

Only if a defendant meets this standard will the burden shift to the State. *Rodriguez v. State*, 372 Ark. 335, 341, 276 S.W.3d 208, 214 (2008). A defendant who fails to present proof of all three elements has not established a prima facie case. *See, e.g.*, *Walker v. State*, 314 Ark. 628, 633, 864 S.W.2d 230, 232 (1993) (concluding Walker had not established a prima facie case because he did not present any proof on the second and third elements).

African Americans are unquestionably a distinctive group for the purposes of a fair-cross-section analysis. *Castaneda v. Partida*, 430 U.S. 482, 495 (1977). We acknowledge that Burks satisfied this prong of the *Duren* standard; however, this is the only hurdle he cleared.

Under the "fair and reasonable representation" prong, the inquiry is whether the representation of African Americans in the jury venire was fair and reasonable in relation to the number of African Americans in Garland County eligible for jury duty. *See Duren*, 439 U.S. at 364. Burks must support his claim with accurate, reliable data. *Id.* He failed to do so. This second *Duren* prong effectively requires statistical evidence, although no specific method has been endorsed by the Supreme Court. *See Berghuis v. Smith*, 559 U.S. 314, 329–30 (2010). Burks's objection to the composition of the jury panel in his case is merely a personal observation by his counsel regarding the jurors who were called for jury duty in his case. Burks failed both before the trial court and in his brief before this court to conclusively identify the race of any of these 184 jurors who were called—or the larger panel from which they were selected.

Even assuming that defense counsel correctly identified the African Americans on the jury panel called in Burks's case, the fair-cross-section requirement is a way of assuring

an impartial jury, not of creating a representative jury. *See Holland v. Illinois*, 493 U.S. 474, 480 (1990); *see also Thomas*, 370 Ark. at 77, 257 S.W.3d at 98 (holding there is no requirement that the petit jury actually seated in a defendant's case mirror the community and reflect the various distinctive groups in the population).

In *Rodriguez*, 372 Ark. at 342, 276 S.W.3d at 214, the supreme court noted that a movant's opinion with regard to the racial makeup of the group constituting his or her jury panel was insufficient to establish proof of systematic exclusion inherent in the venire or the system. *Id.* Likewise, in *Navarro v. State*, 371 Ark. 179, 194, 264 S.W.3d 530, 541 (2007), the supreme court relied on *Duren* to hold that the test regarding whether there is a reasonable representation of the distinctive group requires analysis of every venire from which juries are selected, not just the particular venire summoned at a defendant's trial. *Id.* at 194, 264 S.W.3d at 541.

Despite the fact that Navarro provided more information than Burks provided in this case—he offered statistical data with regard to the county-wide population of the distinctive group (Hispanics) in question—similar to Burks, he offered no proof of the number of Hispanics on every jury venire in Washington County. *Id.* When not presented with data as to the representation of a particular group in all jury venires in the county, our supreme court has declined to speculate regarding the composition of them. *See Danzie v. State*, 326 Ark. 34, 43, 930 S.W.2d 310, 315. Burks did not meet his burden of establishing the composition of the jury venire and failed to demonstrate that Garland County systematically

15

excluded African Americans from jury pools. Consequently, we hold that the trial court did not err by rejecting his claim.

Finally, because Burks failed to demonstrate the composition of the entire jury venire, he can offer no reliable conclusion with regard to how the alleged underrepresentation in his jury venire was the result of systematic exclusion across all the jury venires. *See Navarro*, 371 Ark. at 194, 264 S.W.3d at 541. Accordingly, he also has failed to meet the third *Duren* prong. Because he failed to make a prima facie case, we affirm the trial court's denial of Burks's motion for mistrial.

## C. Jury Instruction on Lesser-Included Offense of Second-Degree Murder

During the trial court's consideration of jury instructions, Burks's counsel indicated that she did not want a jury instruction on the lesser-included offense of second-degree murder. He had been charged in the second amended criminal information with first-degree murder, committing a terroristic act (three counts), and a sentence enhancement for use of a firearm. All the charges were based on a theory of accomplice liability. Burks's argument against giving the jury instruction on second-degree murder was that the State had charged Burks with first-degree murder, and there was insufficient evidence that he knew Tommy had a gun or that a lay witness said it was his purpose to fight. The trial court gave the second-degree-murder instruction over Burks's objection.

Burks argues that there was no evidence that he either knew Tommy would bring a firearm and planned to shoot anyone or asked Tommy to bring a firearm or to shoot anyone. There was only vague testimony that Burks wanted to "fight." Burks submits that an

16

accomplice is not liable for acts that he did not aid, solicit, plan, advise, or coerce. He claims that he should only be held legally responsible for any crime in which he actively participated. He cites *Wilson v. State*, 25 Ark. App. 126, 753 S.W.2d 287 (1988), for the proposition that accomplice liability should be defined in terms of the crime that was planned. Burks maintains that there was no evidence of a plan by him to aid, solicit, or advise Tommy to shoot at Donyell or the vehicle with four occupants.

Burks points out that Arkansas Code Annotated section 5-1-110 provides that a trial court is not obligated to instruct on a lesser-included offense unless there is a rational basis for concluding that the criminal defendant might be acquitted of the crime charged and convicted of the lesser-included offense. He argues that because the only basis for charging him with a crime was that he acted as an accomplice, and there was no rational basis for giving the lesser-included instruction on second-degree murder because there was no evidence that he aided, solicited, or encouraged Tommy or that he planned to aid, solicit, or encourage Tommy.

He submits that, as a matter of trial strategy, he should have been allowed to choose to stand on submitting the case to the jury on the crime as charged. He was charged with first-degree murder and based his trial strategy on the argument that he did not meet the standard of culpability required for a conviction for first-degree murder. Burks's liability on all of the offenses charged was based on accomplice liability because he was not the individual who discharged the firearm that precipitated the charges. Burks notes that the State's theory was that he had called Tommy, and that was the reason Tommy was at the scene where he

shot a gun into the car. He maintains that there was no evidence that he asked Tommy to come to Lily Ruth Court, bring a gun, shoot at anybody, or kill anyone.

We agree with the State that because the trial court properly instructed the jury on second-degree murder, we must reject Burks's claim. *See, e.g., Gray v. State*, 2021 Ark. App. 406, at 10, 636 S.W.3d 102, 109, *reh'g denied* (Dec. 8, 2021), *cert. denied*, No. 21-7752 (U.S. June 27, 2022).

In *State v. Jones*, 321 Ark. 451, 455, 903 S.W.2d 170, 173 (1995), the supreme court opined that "[p]lainly, § 5-1-110(c) does not delegate the decision regarding the propriety of a lesser included offense instruction to the defendant, but requires the [trial] court to determine whether the proffered instruction concerns a lesser included offense and, if so, whether a rational basis exists for a verdict acquitting the defendant of the greater offense and convicting him of the lesser."

Here, the trial court considered defense counsel's objection and noted that there was trial testimony that indicated Burks solicited the aid of another person—Tommy—so that he could return to the place where he had been insulted and resume the altercation with Donyell. The jury could reasonably conclude from the trial testimony regarding the actions taken by Burks—along with his subsequent statement to police—that he intended to purposely cause serious physical injury to Donyell, and in the attempt to do so, his accomplice caused the death of Donyell. *See* Ark. Code Ann. § 5-10-103(a)(2). Accordingly, the trial court ruled that there was a rational basis for giving the instruction and overruled Burks's objection.

18

Burks also complains that "[a]s a matter of trial strategy," he "should have been allowed to choose to stand on submitting the case to the jury on the crime as charged." However, as the *Jones* case makes clear, a defendant's all-or-nothing strategy does not dictate how the trial court instructs the jury. *Jones*, 321 Ark. at 456, 903 S.W.2d at 173. Accordingly, we hold that the trial court did not abuse its discretion by instructing the jury on the lesser-included offense of second-degree murder.

Affirmed.

ABRAMSON and MURPHY, JJ., agree.

*Knutson Law Firm*, by: *Gregg A. Knutson*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.